[No. 29164. *En Banc.* November 16, 1944.]

RAY W. RANDALL *et al., Respondents,* v. TRADEWELL STORES, INC., *Appellant.*[1]

[1]Reported in 153 P. (2d) 286.

*Ryan, Askren & Mathewson, I. J. Bounds,* and *Howard W. Sanders,* for appellant.

*Walter V. Swanson,* for respondents.

ROBINSON, J.—This action was brought to recover damages for alleged breach of contract. In August, 1939, plaintiffs, Randall and Doyle, purchased from defendant, Tradewell Stores, Inc., three retail groceries, two of which were located in Yakima, the third in Toppenish. The contract of sale contained the following provision:

"(5) It is understood that the Seller is on the direct buying list and agrees to buy direct for the Purchaser merchandise from time to time as requisitioned by the Purchaser, the Purchaser agreeing to accompany each requisition with a check in sufficient amount to pay the

cost of such merchandise to the Seller. The Seller agrees to render such buying service without charge to the Purchaser until January 1st, 1940. After January 1st, 1940, the Seller agrees to continue to render such service subject to the payment of a fee by the Purchaser in an amount to be mutually agreed upon for the services rendered."

The breach, concerning which damages are claimed, is alleged to have been a refusal of Tradewell to continue to afford the plaintiffs the direct buying privilege thus provided for. Through that privilege they were enabled to purchase commodities at the manufacturers' price, which was from five to seven per cent less than they could be obtained through wholesalers. It was, therefore, manifestly a very valuable right, and the plaintiffs contended, and testified, that without its inclusion they would not have made the purchase.

The action was tried to a jury. The defendant vigorously cross-examined the plaintiffs and their witnesses, and, in so doing, introduced nine or ten documentary exhibits. Other than these exhibits, it offered no evidence, but stood upon its motion for nonsuit or directed verdict made at the close of plaintiffs' case. The jury returned a verdict in the sum of twelve thousand nine hundred dollars.

As to the post-trial motions, the trial judge first rendered a memorandum opinion to the effect that defendant's motion for judgment notwithstanding the verdict should be granted. Some six weeks later, he filed a second and complete memorandum, reviewing and analyzing the case in all its aspects. In this memorandum, he held that the motion for judgment notwithstanding the verdict should be denied, but ordered that a new trial should be granted unless the plaintiffs, within ten days, filed a written consent to the entry of a judgment for five thousand dollars. The plaintiffs duly filed consent, and a judgment for five thousand dollars was entered, from which defendant appeals.

The plaintiffs also complain of the judgment and urge this court to order the entry of judgment in accordance with the jury's verdict.

The defendant-appellant, under the caption "Questions

Involved," states seven questions and makes four formal assignments of error. Its contentions may be best stated by quoting the concluding words of its brief:

"We therefore respectfully submit:

"1. That the buying contract was terminable at will by either party.

"2. That there is no evidence upon which a jury could determine the amount of future profits the respondents would have earned or damages which the respondents sustained by reason of the increased price they may have been required to pay.

"3. That respondents wholly failed to make any effort whatsoever to mitigate their damages.

"For these reasons the judgment of the court below must be reversed and the case remanded with instruction to enter judgment in favor of the appellant."

■ As to contention three: Ordinarily, the verdict of the jury would dispose of the matter of mitigation, and, in the state of the record, we hold that it did. The instructions to the jury have not been included in the statement of facts or in the transcripts furnished us by the parties to the appeal, but that the matter of mitigation was put to the jury is clear from the following portion of the trial court's second and final memorandum. We quote from page 355 of the statement of facts:

"On the question of the plaintiff's duty to mitigate damages, a similar problem is presented. While the court did not feel that the plaintiffs had performed their duty in this regard, it is possible that the jury may have determined that they did all that was reasonably necessary, and that it would have been an unreasonable burden to have required them to seek entry into the Associated Grocers or to have made large purchases of the S. & W. line of groceries. According the evidence an interpretation that gives the plaintiffs the benefit of 'all inferences that can be reasonably drawn therefrom,' the Court cannot say that reasonable minds would not differ on the question as to whether or not the plaintiffs had done the things reasonably necessary to mitigate their damages."

We have examined the evidence relating to this point and have arrived at the same conclusion.

The appellant's principal contention is that the buying privilege "was cancellable at will," because no time limit is specified in the contract. Reliance is placed upon the following excerpts from our own decisions:

"It is a little difficult to follow appellant's theory of the case. It appears to us that, if there is a cause of action stated in the complaint, it is by reason of the alleged breach of the washing contract as contained in the letter above quoted. The rule seems to be that, there being no time limit specified in a contract of this kind, it is subject to cancellation at the will of either party. 13 C. J. 604, § 630." *Robbins v. Seattle Peerless Motor Co.,* 148 Wash. 197, 198, 268 Pac. 594.

"We do not find in the record testimony as to any agreed duration of these standing orders, and, following the case of *Robbins v. Seattle Peerless Motor Company,* 148 Wash. 197, 268 Pac. 594, we hold that the contract between the parties to this action, in so far as the standing orders are concerned, was terminable at will by either party. The general doctrine is stated in 13 C. J., p. 604, as follows:

" 'The rule seems to be that, there being no time limit specified in a contract of this kind, it is subject to cancellation at the will of either party.' " *National Grocery Co. v. Santaella & Co.,* 160 Wash. 262, 264, 295 Pac. 128.

The respondents, contending that the contract is, on its face, ambiguous, and not merely ambiguous but manifestly incomplete, offered oral evidence, which was admitted over vigorous and continuous objection, and its admission is here relied upon as error. It appears that, after some preliminary negotiations, a written contract was prepared, signed, and acknowledged by the president and secretary of Tradewell on August 11, 1939. On the next day, its secretary, Mr. Eba, took the instrument to Yakima and conferred with the respondents, Randall and Doyle. As the result of this appeal largely turns upon whether the conversations between the parties at this time were admissible in evidence, it is necessary to quote the salient points thereof. Doyle testified, in part, as follows:

"A. We went over the contract, Ray and I sitting on one side of the table in the hotel room, and signed it. Then we asked Mr. Eba that there was one point that we wanted

to be clear on. I asked Mr. Eba specifically how much this would cost us. I said, this is a little bit — this is supposed to be mutual, but how much will this cost us after 1940, after this free period has elapsed. He grinned, and he said, well, he said, it is only a small charge for bookkeeping entry, that would be negligible, there wouldn't be hardly any charge, maybe two or three dollars, just to take care of the entries, it wouldn't be any charge to it at all to speak of. That's just the language he phrased to me, so I turned to Ray and said, that's all right as far as we're concerned, we'll give them their copy of the contract. Q. And, at that time, you had signed the contract and you gave them one copy and kept one yourself? A. That's right. Q. Was anything said about the period of time in which this buying clause should operate? A. Mr. Eba said that it would go as long as we owed them any money, why, we could have the advantage of their buying facilities. Q. When was that said? A. At the same time, after we had signed the contract, when I was asking him about the amount that was to be mutually agreed upon."

Randall testified, in part, as follows:

"Q. Will you state the conversation that happened at the time of the signing of this contract and immediately thereafter? A. When we had negotiated the deal to our satisfaction, more or less, we — the question of the buying clause came up. Q. Just a minute. Was it signed first? A. Yes, sir. Q. Then what happened? A. Then we discussed the buying clause. Q. Very well. State the discussion. A. Mr. Doyle brought up the question as to the fee that was to be charged us and for the length of the purchasing agreement, and Mr. Eba assured us that the fee would not be in excess of any reasonable amount and that the contract would run for the period as long as we owed them any money. . . . Q. When was the buying clause in that contract discussed with reference to its importance to the rest of the contract in that meeting? A. Very lengthy discussion, yes, sir. Q. What was said about its importance, if anything? A. It was agreed that the buying clause was very, very essential because it was the means of more or less keeping us competitive with other large operations and Mr. Eba made the remark at the time that to help us in our buying would enable them eventually to collect their money and that was what they were interested in. Q. How long did you operate under that buying

clause? A. Until February, 1942. Q. Why did you cease to operate under the buying clause in February of 1942? A. We were informed by Tradewell Stores that would no longer be in effect."

Appellant contends that, although the contract was executed before these conversations took place, there was, in law, no contract until it was delivered, and, therefore, the conversations cannot be regarded as modifying an existing contract; and further, that, since the conversations took place before the contract was completed by delivery, they merged in the contract, and it is said:

"If conversations such as this are admissible, then there is no such thing as a rule against oral testimony to vary the terms of a written contract."

[2] The rule forbidding oral testimony to vary the terms of a written contract, though more than a mere rule of evidence, derives from the just and logical presumption that persons who take the trouble to reduce their engagements to writing naturally include therein the whole of their agreement. When, therefore, a contract shows on its face that it is manifestly incomplete, it is not surprising to find that the parol evidence rule is, to some extent, relaxed. The case of *Gaffney v. O'Leary*, 155 Wash. 171, 283 Pac. 1091, may serve as an example. It is said in 3 Williston on Contracts (Rev. ed.) 1821, § 633:

"It is generally held that the contract must appear on its face to be incomplete in order to permit parol evidence of additional terms."

■ Parol evidence may also be admitted and, sometimes, is necessarily admitted as an aid to interpretation. It is said in the same volume of Williston at page 1817:

"All courts agree that the written memorial must be interpreted according to legal rules, and that, when so interpreted, meanings may sometimes be given to it which would not have been apparent without parol evidence."

That has been the holding of this court. *Heaton v. Smith*, 134 Wash. 450, 235 Pac. 958. In no case, of course, can parol evidence be admitted which is inconsistent with the

written instrument. These rules are universal. See Restatement of Contracts, Vol. 1, chapter 9, Topic (1), Interpretation, and Topic (2), Parol Evidence Rule.

In the contract involved in this case, it was provided that the purchasers should pay five thousand dollars upon its execution, five thousand dollars more when the inventory of stocks on hand should be taken and the keys delivered, plus the amount, if any, that the inventory values might run in excess of ten thousand dollars, and that the purchasers should execute and deliver their promissory note for ten thousand dollars, to be executed as of August 14, 1939, payable in ten equal installments of one thousand dollars each, the first to be due January 1, 1940, and the remainder to be due and payable semiannually on the first day of July and January of each year. There were three operating stores involved in the purchase and an investment of at least twenty thousand dollars. That the right to buy commodities, to be retailed in these stores at from five to seven per cent less than wholesalers' prices, was of the very highest importance to the respondents, needs no argument or demonstration. There can be no doubt but that they bargained for it. It can readily be conceived that, as they claimed, they would not have entered into the contract without it. As we have already seen, the contract reads, in part:

"The Seller agrees to render such buying service without charge to the Purchaser until January 1st, 1940. After January 1st, 1940, the Seller agrees to continue to render such service subject to the payment of a fee by the Purchaser in an amount to be mutually agreed upon for the services rendered."

The service was rendered until January, 1940, as stipulated, and, in fact, until February, 1942. It was then refused. It was contended by the appellant at the trial that, after January 1, 1940, it could cancel that service at will, because (1) the contract provides no time limit, and (2) there was no mutuality.

The obligation to afford the buying privilege is not a collateral one, nor an independent covenant. It is an in-

tegral part of the entire contract and an inseparable part of the consideration. Its insertion in the contract was clearly for the mutual benefit of the contracting parties. That it was as to the purchasers, is perfectly evident; and that it was to the advantage of the seller that the purchasers should operate at a profit as long as any portion of the purchase price remained unpaid, is equally manifest.

That it is the intent of the contract that the seller should be bound to render the buying service after January 1, 1940, is unmistakable. The language is: "After January 1st, 1940, the Seller, agrees to continue to render such service," etc. To say that the seller could cancel that promise at will—that is, on January 2nd, or even on January 1st—is to say that it could utterly destroy the promise and avoid its obligation. We, of course, do not construe the word "after" as meaning "forever after," but we think it clearly connotes a measurable segment of time after January 1, 1940. We further think that the trial court might well have held, as a matter of law, that the segment of time intended was the remaining life of the contract.

The trial court, however, apparently decided to leave the determination of that matter to the jury, and, perhaps, this was the better course. It, therefore, admitted evidence of conversations between the parties contemporaneously with the making of the contract, in order that the intention of their contract might be found and its ambiguity resolved. In so doing, the trial court (the superior court in and for Yakima county) went scarcely as far as it did in admitting parol evidence for a like purpose in the trial of the case of *J. W. Seavey Hop Corp. v. Pollock,* 20 Wn. (2d) 337, 147 P. (2d) 310. Yet, on appeal, we approved its rulings as to the admission of parol evidence in that case in a departmental opinion handed down in March of this year.

It will be remembered, however, that the furnishing of service after January 1, 1940, was subject to a condition. The language is:

"After January 1st, 1940, the Seller agrees to continue to render such service *subject to the payment of a fee by*

*the Purchaser in an amount to be mutually agreed upon for the services rendered."* (Italics ours.)

It is contended that no evidence was produced from which the jury could find that this amount was ever agreed upon, and that, therefore, the refusal to continue the service was not a breach of contract.

On October 15, 1940, more than nine months after the date the respondents were required by the contract to commence paying a fee for the buying service, the appellant wrote them the following letter:

"Mr. Bean has gone into the matter of our buying set-up for your stores very thoroughly with our attorney in Seattle, and we find that our present arrangement for handling the account is illegal.

"According to the opinion of our attorney the only basis on which we can set this up is on a flat service charge fee. We have tried to arrive at some figure that would be approximately the same as you are now paying on a portion of the cash discount, and we believe that a flat service charge of $5.00 a month would take care of this.

"Of course, some months you would not be buying anything, or very little, and in other months your purchases would amount to considerably more on a cash discount basis than the $5.00. On an entire year's purchases we believe this figure of $5.00 would not be excessive for the service we render, and this arrangement would put us in the clear as far as any legal technicalities are concerned.

"If this does not meet with your approval, please let us know at once, giving us your suggestion for an equitable figure. If you think our suggestion is fair, please forward us your check the first of each month covering this service charge. We would appreciate your prompt reply."

It is clear from the foregoing letter that, prior to its date, October 15, 1940, and presumably since January 1, 1940, the respondents had been paying a fee for the buying service. It would seem from the second paragraph that it was paid by deducting a certain percentage from allowable discounts. However that may be, and this is the essential fact, it appears clearly enough that the jury could find that it was paid pursuant to an agreement between the parties. The appellant speaks of it in the first paragraph

of the letter as "our present arrangement," and, in the third paragraph, proposes another and substitute "arrangement," that is, a flat fee of five dollars per month.

The material part of respondents' prompt note in reply to appellant's letter enclosing a check for five dollars was as follows: "We will send you a check for $5.00 per month until we promote a change in that policy."

Appellant contends, and correctly, that this was not an unqualified acceptance of the proposition made in its letter. It is further urged that it must be concluded that no mutual agreement on a five dollar monthly fee was arrived at by this exchange of letters. That would seem to be a sound contention also. But if the attempt to make a substitute agreement failed, would it not leave the existing agreement under which the parties had been operating for the previous nine months in full force and effect? It is unnecessary to pursue this inquiry, however, for there is other evidence in the record from which the jury could find that the five dollar monthly fee was in fact agreed upon. We quote from the evidence of respondent Doyle, as it appears on page 27 of the statement of facts:

"Q. After January 1st, 1940, what arrangement was made to continue purchases in that manner? A. Arrangements, after 1940, were for $5.00, $5.00 a month during the balance of the contract. Q. Do you mean to say that you paid them $5.00 a month for this buying charge? A. Yes, we did. Mr. Bounds: Now, just to them. To whom? The Witness: We paid that to Tradewell Stores, I think. Tradewell Stores is who we sent the checks to. Q. And how long did you continue that manner of buying? A. We paid the $5.00 a month up till the time they refused to buy for us, in February of this year."

No witnesses were called by the defendant and, at the close of the trial, the above testimony stood unrebutted and unimpeached.

Since "this year" was 1942, it is apparent that the jury was entitled to find that, from November 1, 1940, to February, 1942, the respondents paid, as a fee for the service rendered, five dollars per month for fifteen consecutive months, and that the appellant, for fifteen consecutive

months, accepted these payments as and for a fee for the rendition of the service. Clearly, the jury could reasonably infer that the five dollars monthly charge had been mutually fixed and agreed upon, and, the appeal being from a judgment rendered on a jury verdict, the respondents are entitled to the benefit of all favorable inferences that may reasonably be drawn from the evidence.

Since we have concluded that there was a time limit as to appellant's obligation to furnish the buying service, and that the jury could so find, the two cases upon which the appellant has principally relied, that is, *Robbins v. Seattle Peerless Motor Co.*, 148 Wash. 197, 268 Pac. 594, and *National Grocery Co. v. Santaella & Co.*, 160 Wash. 262, 295 Pac. 128, need not be discussed. To such a state of facts they are clearly inapplicable, since they apply only to situations where no time limit is indicated in the contract. It remains necessary, however, to discuss the matter of damages, which, the appellant urges, are wholly speculative.

■ It is clear that the evidence is such as not to permit a calculation of damages with mathematical certainty. That is rarely, if ever, possible in this type of case. But there is, in our opinion, sufficient to afford a basis for a judgment of five thousand dollars, which, in the present state of the matter, is the amount with which we are concerned. We cannot take the space that would be required to analyze the great volume of evidence as to damages, which is both oral and documentary, the latter class comprising probably more than two thousand pages of accounts. We confine ourselves to the following general observations:

In the first place, the respondents were conducting an established business, and there is quite definite proof of experience in the use of the buying privilege from late August of 1939 to February of 1942. This is followed by documentary evidence of the marked and steady growth of the volume of the business. It is stoutly maintained by appellant, and with good reason, that due to the war many of the commodities, concerning which the buying privilege would probably have been used, became wholly unobtain-

able; and further, that it was itself refused buying privileges by the General Food Products Company. We think, however, that such objections, together with the objection that the appellant sold the note to another corporation which owned all of its stock, and that corporation extended the time for payment, were compensated for by the ultimate entry of a judgment for five thousand dollars on a verdict for twelve thousand nine hundred dollars. We are satisfied that there is ample evidence to support a judgment for the lesser amount, under the rules laid down in *Belch v. Big Store Co.*, 46 Wash. 1, 89 Pac. 174; *Loutzenhiser v. Peck*, 89 Wash. 435, 154 Pac. 814; and *Seeley v. Peabody*, 139 Wash. 382, 247 Pac. 471.

 Although the respondents have not cross-appealed, they pray for entry of judgment upon the verdict, relying upon Laws of 1933, chapter 138, p. 482, § 2 (Rem. Rev. Stat. (Sup.), § 399-1 [P. C. § 8225-1]), which is as follows:

"If the trial court shall, upon a motion for new trial, find the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice, the trial court may order a new trial or may enter an order providing for a new trial unless the party adversely affected shall consent to a reduction or increase of such verdict, and if such party shall file such consent and the opposite party shall thereafter appeal from the judgment entered, the party who shall have filed such consent shall not be bound thereby, but upon such appeal the supreme court shall, without the necessity of a formal cross-appeal, review *de novo* the action of the trial court in requiring such reduction or increase, and there shall be a presumption that the amount of damages awarded by the verdict of the jury was correct and such amount shall prevail, unless the supreme court shall find from the record that the damages awarded in such verdict by the jury were so excessive or so inadequate as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice."

It is contended that this court must review this cause *de novo,* and that, unless on such review it affirmatively finds that the jury verdict was so excessive as unmistakably to indicate that the amount thereof must have been the result

of passion and prejudice, it must order the entry of judgment for twelve thousand nine hundred dollars.

Some doubts have been expressed as to the competence of the legislature to enact § 2 of chapter 138 of the Laws of 1933, if the section be given a literal and mandatory interpretation. We shall not enter into that inquiry, because we think that it appears on the face of the statute that § 2 is not applicable to the instant case. The right of a trial court to tender a plaintiff a choice between a new trial or a judgment less than the verdict rendered by the jury was not created by § 2 of chapter 138, Laws of 1933, for it was previously held in *Ulvestad v. Dolphin,* 158 Wash. 629, 292 Pac. 106, a case decided in 1930:

"In this jurisdiction, the court may, when it deems the verdict excessive, tender the plaintiff a judgment for a less sum than that returned by the jury, and give him the option to take a judgment for the sum tendered or submit to a new trial."

Nor does § 2, chapter 138, Laws of 1933, restrict the right of the trial judge to tender such an option to a case where he deems a verdict excessive as a result of passion and prejudice, for subdivisions 5 and 6 of § 1 of that very act (Rem. Rev. Stat. (Sup.), § 399), setting out the grounds for a new trial, are as follows:

"5. Damages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice;

"6. Error in the assessment of the amount of recovery, whether too large or too small, when the action is upon a contract, or for the injury or detention of property."

This is an action on contract. Furthermore, § 2 of chapter 138, Laws of 1933 (Rem. Rev. Stat. (Sup), § 399-1), clearly applies only to new trials granted under subdivision (5) of § 1 of that act (Rem. Rev. Stat. (Sup.), § 399). This subdivision is quoted above. It will be noted how clearly its language is followed in the opening sentence of § 2, which states the conditions under which the section is operative, as follows:

"*If the trial court shall, upon a motion for new trial, find*

*the damages awarded by a jury to be so excessive or in-
adequate as unmistakably to indicate that the amount
thereof must have been the result of passion or prejudice,*
the trial court may order a new trial or may enter an order
providing for a new trial unless the party adversely af-
fected shall consent to a reduction or increase of such ver-
dict, . . . " (Italics ours.)

There is nothing whatever in the record indicating that
the trial judge, in entering the order granting a new trial
unless the plaintiffs should consent to reduction of the ver-
dict, did so because he found the verdict excessive as the
result of passion or prejudice. In the long memorandum
opinion which ends with the pronouncement of the order it-
self, the words "passion or prejudice" are nowhere found.
On the other hand, in the five pages of the memorandum
devoted to showing his right to make the order, the trial
judge repeatedly refers to his duty to make it if, in his
opinion, substantial justice has not been done, citing many
authorities to that effect. We, therefore, come to the end
of the matter, for, manifestly, we cannot review a finding
that the verdict was the result of passion or prejudice
when no such finding, formal or otherwise, can be found in
the record.

The judgment from which this appeal is taken is affirmed.

BLAKE, JEFFERS, and MALLERY, JJ., concur.

STEINERT, J. (concurring in the result)—Since the con-
tract here involved did not provide the length of time of its
continuance or when it should terminate, a reasonable time
is to be implied. *Littlefield v. Bowen,* 90 Wash. 286, 155
Pac. 1053, Ann. Cas. 1918B, 177; *Robinson v. Davis,* 158
Wash. 556, 291 Pac. 711; *Foelkner v. Perkins,* 197 Wash.
462, 85 P. (2d) 1095; 12 Am. Jur. 854, Contracts, § 299.

In the *Littlefield* case, *supra,* this court said, on page 293
of the state report: "The contract did not itself provide
a time for its termination. In such case a reasonable time
was implied."

In determining what is a reasonable time within such
implication, all the surrounding facts and circumstances

of the case, including the conversations and parol agreements between the parties, are admissible.

"By the weight of authority this implication is one of mixed fact and law; and as bearing thereon and tending to establish what is a reasonable time, extrinsic evidence of all the surrounding facts and circumstances, including the declarations and conversations of the parties and any parol agreement between the parties as to a specific time of delivery, is admissible." 20 Am. Jur. 978, Evidence, § 1120.

The instructions which the trial court gave to the jury are not in the record brought to this court, and it therefore must be assumed that the court instructed the jury in accordance with the law as hereinbefore stated. If the court did so instruct the jury, then the trier of the fact could very logically have found that the buying service was to be rendered by the appellant to the respondents for a period of five years, that being the time during which respondents were obligated to make semiannual payments of one thousand dollars each on the contract. The evidence was sufficient, in my opinion, to sustain the judgment of five thousand dollars on that theory.

For the reasons herein given, I concur in the result of the majority opinion.

GRADY, J., concurs with STEINERT, J.

SIMPSON, C. J. (dissenting)—The question presented is whether a contract which does not indicate a time limit may have a definite time fixed by parol evidence.

The contract under consideration is clear upon its face. Therefore, parol evidence should not have been received by the court to fix any definite time that it was to run. The reason for so stating is that the evidence which attempted to fix the time related entirely to conversations had between the parties at the time the contract was signed and before its delivery.

The general rule excluding evidence of contemporaneous or prior verbal agreements, varying by adding to or taking from the contents of a written instrument, is the outgrowth of the common experience of human beings. It is of great

antiquity, and appears in other systems of jurisprudence besides our own. It rests upon principles somewhat analogous to those which underlie the doctrine of the conclusiveness of judgments upon parties thereto. It is said to be in the interest of the state that there should be an end to litigation. Accordingly, the record which closes a forensic controversy is regarded as merging the matters litigated to the extent declared in the judgment. So in private adjustments of reciprocal rights it is wisely considered that, when parties have deliberately put their mutual agreements into the form of a completed written contract, that expression of their contention should be accepted as a finality, in which is merged all prior negotiations within the scope of the writing. But the rule has too long occupied a place as a cornerstone in the law of evidence to require at this day any justification for its existence. It is proper to remark, however, that the adoption of the rule announced by the majority seems to me to illustrate a cogent reason in addition to those existing in the common law for a close adherence to the rule under discussion.

Under the authority of the majority opinion, it is clear that hereafter every contract construed in this state, whether written or not, will ultimately rest in parol. Every written contract, including those mentioned by the statute of frauds, will be enforcible, regardless of its contents, for the reason that oral evidence may be admitted to supply any deficiency required to make written contracts enforcible.

"A written contract which is complete in itself and the validity of which is conceded cannot be varied by showing that prior or contemporaneous agreements were made which were not reduced to writing but, in accordance with the understanding of the parties thereto, were to remain in full force and effect. The prior mutual understanding of the parties is unimportant when they have signed a contract covering the subject-matter thereof. It is well settled that the execution of a contract in writing supersedes and merges all the oral negotiations or stipulations concerning its terms and the subject-matter which preceded or accompanied the execution of the instrument, in

the absence of accident, fraud, or mistake of facts; and in action on the contract any representation made prior to or contemporaneous with the execution of the written contract is generally inadmissible to contradict, change or add to the terms plainly incorporated in and made a part of the written contract. This rule is equally applicable where the intention of the party is set out in two written instruments as well as where it is contained in only one.

"When the parties of their own volition omit certain terms in reducing the contract to writing, as where a clause providing for the abatement of rent is voluntarily omitted, the terms thus omitted cannot be enforced." 2 Elliott on Contracts 926, § 1620.

"No authority sustains the proposition that, under the guise of construction or explanation, a meaning can be given to an instrument which is not to be found in the instrument itself, but is based entirely upon direct evidence of intention independent of the instrument. It has been well said that, in the admission of extrinsic evidence, the line which separates evidence which aids the interpretation of what is in the instrument from direct evidence of intention independent of the instrument must be kept steadily in view, the duty of the court being to declare the meaning of what is written, and not what was intended to be written.

"Inadmissible parol evidence tending to contradict the terms of a written contract should not, when received in opposition to oral testimony corresponding with the unambiguous language in the contract, be allowed to render nugatory the words of the instrument. Where a contract is a complete workable and unambiguous instrument it does not require either evidence of usage or implication of law to interpret it." 6 Cal. Jur., p. 251, Contracts, § 162.

The majority opinion admits that:

"The obligation to afford the buying privilege is not a collateral one, nor an independent covenant. It is an integral part of the entire contract and an inseparable part of the consideration. Its insertion in the contract was clearly for the mutual benefit of the contracting parties. That it was as to the purchasers is perfectly evident, and that it was to the advantage of the seller that the purchasers should operate at a profit as long as any portion of the purchase price remained unpaid is equally manifest."

It is apparent that the element of time must be clearly stated in the contract if the contract is enforcible. *Robbins v. Seattle Peerless Motor Co.*, 148 Wash. 197, 268 Pac. 594; *National Grocery Co. v. Santaella & Co.*, 160 Wash. 262, 295 Pac. 128; 13 C. J. 604, Contracts, § 630; 17 C. J. S. 887, Contracts, § 398.

In *Robbins v. Seattle Peerless Motor Co., supra,* the written contract dated April 2, 1927, confirming "our verbal conversation regarding washing cars," gave to Robbins "the washing of all our cars" at stipulated rates. That is, "from now on" or from April 2, 1927, date of execution of the contract, Robbins agreed to render certain service subject to payment of a stated fee by the other party. We said, in our opinion affirming judgment dismissing Robbins' action on the contract:

"It is a little difficult to follow appellant's theory of the case. It appears to us that, if there is a cause of action stated in the complaint, it is by reason of the alleged breach of the washing contract as contained in the letter above quoted. The rule seems to be that, there being no time limit specified in a contract of this kind, it is subject to cancellation at the will of either party."

In *National Grocery Co. v. Santaella & Co., supra*, plaintiff recovered a judgment in an action against defendant for failure to fill standing orders. We reversed the judgment and, in the course of our opinion, said:

"We do not find in the record testimony as to any agreed duration of these standing orders, and, following the case of *Robbins v. Seattle Peerless Motor Company*, 148 Wash. 197, 268 Pac. 594, we hold that the contract between the parties to this action, in so far as the standing orders are concerned, was terminable at will by either party. The general doctrine is stated in 13 C. J., p. 604, as follows:

" 'The rule seems to be that, there being no time limit specified in a contract of this kind, it is subject to cancellation at the will of either party.' "

The case at bar is indistinguishable on principle from the two cases cited, and the contract in the first case cited is very similar on the facts to the case at bar. In the instant case, the parties agreed that from January 1, 1940

(just as in *Robbins v. Seattle Peerless Motor Co., supra,* the agreement was from April 2, 1927), the seller would continue to render the service subject to the payment of a fee by the purchaser to be determined to the mutual satisfaction of the parties.

With these two cases in mind, it must be admitted that the rule in this state is that, where a written contract is without any time limit, neither of the parties to the contract may prove an oral modification of contract made prior to delivery of the contract for the purpose of fixing a definite duration, and that such contract may be canceled at any time at the will of either party.

However, the question of fixing a time by parol evidence was not presented in the cases to which I have just referred.

The parol evidence introduced in this case varied the contract by changing the indefinite time mentioned in the agreement to a time that was definite. A thorough search of the authorities does not reveal that any court or any textbook writer has adopted or approved a rule similar to the one announced by the majority in this case. 20 Am. Jur., p. 978, Evidence, § 1120, states the rule:

"The view has been taken that where no time is expressed in an executory contract for its performance, the law implies that it shall be performed within a reasonable time. *Parol evidence cannot be introduced to show that a specified time was agreed upon by the parties in such a case or that the time for performance is other than a reasonable time.* By the weight of authority this implication is one of mixed fact and law; and as bearing thereon and tending to establish what is a reasonable time, extrinsic evidence of all the surrounding facts and circumstances, including the declarations and conversations of the parties and any parol agreement between the parties as to a specific time of delivery, is admissible. It has been held that evidence of what the obligors said at the time of contracting to make an invoice within a reasonable time, about the time when it would be practicable and convenient for them to make it, is admissible upon the question of what is reasonable time.

"In the case of contracts calling for payments, where no time for payment is expressed, the law requires the pay-

ment to be made immediately. In such a case parol evidence is inadmissible to show that the payment was to be made at some later time.

"The view has been taken, however, that parol evidence is admissible to fix the time when the consideration for a contract is to be paid, where the contract is silent as to this." (Italics mine.)

This statement is based upon a large number of cases from many states in the Union.

12 Am. Jur., p. 854, Contracts, § 299, has this to say about the rule:

"Where, however, there is no provision as to the time for performance, a reasonable time is implied. Thus, completion of a contract within a reasonable time is sufficient if no time is stipulated. Where there is nothing in the transaction of the parties contracting for a piece of work to indicate that any definite time for completing it was in their minds, the law implies that completion was to be made without needless delay and within a reasonable time. What is a reasonable time within which an act is to be performed when a contract is silent upon the subject depends on the subject matter of the contract, the situation of the parties, and the circumstances attending the performance, which may include war conditions, scarcity of ships, and general existing commercial confusion."

The reason for the introduction of oral evidence is that the contract itself implies that it must be performed within a reasonable time. Parol evidence is introduced only for the purpose of making clear the intent contained in the written contract.

In the case at bar, no evidence was produced to indicate the reasonable time. All the evidence purported to show was that the parties had decided upon a definite time. That evidence was not admissible.

In speaking of the time element, the majority has used the expression, "a measurable segment of time," and then from that phrase argues that the parties had in mind a definite time that the contract was to run after January 1, 1940. It is possible that the parties did have a definite time in mind at the time they signed the contract, but, under all the rules of evidence relating to written instru-

ments, it must be conclusively presumed that their ideas and thoughts were embraced in the written contract.

I cannot agree with the majority that appellant waived its rights under the written agreement by charging five dollars per month to continue the purchase. There is no evidence whatever that it was the intention of either party that the five-dollar charge should extend the time for which the contract was to run. Additional evidence relative to the charge was, October 15, 1940, appellant wrote respondents a letter which stated:

"Mr. Bean has gone into the matter of our buying setup for your stores very thoroughly with our attorney in Seattle, and we find that our present arrangement for handling the account is illegal.

"According to the opinion of our attorney the only basis on which we can set this up is on a flat service charge fee. We have tried to arrive at some figure that would be approximately the same as you are now paying on a portion of the cash discount, and we believe that a flat service charge of $5.00 a month would take care of this.

"Of course, some months you would not be buying anything, or very little, and in other months your purchases would amount to considerably more on a cash discount basis than the $5.00. On an entire year's purchases we believe this figure of $5.00 would not be excessive for the service we render, and this arrangement would put us in the clear as far as any legal technicalities are concerned.

"If this does not meet with your approval, please let us know at once, giving us your suggestion for an equitable figure. If you think our suggestion is fair, please forward us your check the first of each month covering this service charge. We would appreciate your prompt reply."

Respondents replied: "Will send you a check for $5.00 per month until we promote a change in this policy."

"Mr. Bounds: I asked him what he meant, 'we promote a change.' I asked him a direct question. . . . A. . . . We had no chance to argue the point of the $5.00 with the people that wrote this letter, so we sent the $5.00 in with this letter, stating that we would send this order in with the $5.00, but we would leave the amount open of $5.00 a month for discussion, whether or not we were satisfied with it. Q. In other words, the $5.00 was not fixed, as far as

you understood? A. As far as we understood, it was fixed so far as they understood. Q. I know, but as far as Randall and Doyle were concerned, as you have just now told the jury, it wasn't fixed; you were looking to further discussion to see if it couldn't be changed? A. That's right."

Surely this cannot be held to be an enforcible contract. The reason that it is not an enforcible contract is that the minds of the parties never met.

In *Washington Chocolate Co. v. Canterbury Candy Makers, Inc.*, 18 Wn. (2d) 79, 138 P. (2d) 195, this court considered a contract for the purchase of chocolate coatings at "current price list." We held that the contract was unenforcible for lack of mutuality. There is no difference in the situation here and that present in the cited case. In neither was there present that concurrence of thought necessary to complete a contract.

The judgment should be reversed.

BEALS, J., concurs with SIMPSON, C. J.

MILLARD, J. (dissenting)—I am in accord with opinion of Simpson, C. J., that, where, as in the case at bar, a written contract is without any time limit, neither of the parties to the contract may prove an oral modification of the contract prior to delivery of the contract for the purpose of fixing the duration of the contract; and that such contract may be canceled at any time at the will of either party.

In *Newton v. Pacific Highway Transport Co.*, 18 Wn. (2d) 507, 139 P. (2d) 725, the superior courts are admonished to follow the opinions of this court. Should we not anticipate the apt retort by the superior courts that man is taught that wisdom does not manifest itself so much in precept as in example; that is, should not our actions and words be all of a color?

With us the rule of legal stability is a myth. Each time we disregard the rule of *stare decisis*, to which I would not yield if by so doing error were perpetuated and principle sacrificed, we advise the bar that it must be content to continue to practice the legal profession in terms of surmise. It may be that I am too insistent in urging respect

for the principle of *stare decisis* and that I display consummate ignorance in continually kicking against the pricks. See Acts 9, 5. However, I would not like to appear, as John Bunyan has it, "much tumbled up and down in my mind," divided between my wish to help a poor litigant and the duty of maintaining legal stability.

The judgment should be reversed.

