[No. 28894. Department One. May 22, 1943.]

WASHINGTON CHOCOLATE COMPANY, *Appellant*, v. CANTERBURY CANDY MAKERS, INC., *Respondent*.[1]

[1]Reported in 138 P. (2d) 195.

*Falknor, Emory & Howe,* for appellant.

*Lloyd R. Savage* and *Eli M. Paulson,* for respondent.

MALLERY, J.—This is an appeal from a judgment of the court notwithstanding the verdict of the jury in favor of the plaintiff, the Washington Chocolate Co., in the sum of fifteen hundred dollars, in an action against Canterbury Candy Makers, for damages for loss of profits, arising by reason of defendant's breach of its contract with the plaintiff to purchase all of defendant's requirements for chocolate coating over a period of five years. Plaintiff appeals.

Appellant, Washington Chocolate Co., is a corporation having its principal place of business at Seattle and engaged in the business of manufacturing and selling chocolate coating for candy. Respondent is Canterbury Candy Makers, Inc., engaged in business at Seattle in the manufacture and sale of candy.

On April 28, 1938, appellant and respondent entered into a contract which reads as follows:

"CHOCOLATE COATING CONTRACT
City: Seattle, Wash.
Date: April 28, 1938.

"CANTERBURY CANDY MAKERS, INC., Seattle, agrees to buy, and WASHINGTON CHOCOLATE Co., Seattle, Wash., agrees to sell *all requirements* lbs. Chocolate Coatings, at follows:

at current price list for a period of five (5) years from above date.

Less 2% 10 days, Net 30. F.O.B. Seattle.

Deliveries to be made as called for from above date to *April 28th, 1943.*

"Any Tax or Duty, Federal and/or State or other Governmental Agency within or without the United States that may be imposed will be in addition to prices named herein and must be paid by purchaser.

"Strikes, differences with workmen, fire, accidents to machinery or other contingencies beyond the control

of the seller to be sufficient excuse for failure to comply with contract.

> "WASHINGTON CHOCOLATE CO.
> By E. E. Hemrich
> President

"CANTERBURY CANDY MAKERS, INC. (Buyers)
  By C. T. Thorsen,
    President."

At the time of the execution of the above mentioned contract, respondent was indebted to appellant in the sum of $2,925, arising out of prior sales by appellant to respondent. On the day following the execution of the contract, appellant entered into a contract with C. T. Thorsen, principal stockholder and officer of respondent corporation, which contract first recited that respondent was indebted to appellant in the sum of $2,925, and that Thorsen was the owner of all the stock of respondent company, and desired personally to assume the indebtedness of the respondent to appellant by the execution of his personal notes to the appellant. The contract then set forth that Thorsen would execute four promissory notes to the appellant in the amount of respondent's obligation and "that until full payment of said notes second party (Thorsen) undertakes and agrees that said Candy Company (respondent) will purchase all chocolate used by it from first party at current price for chocolate at Seattle, Washington, and that same shall be paid for by the Candy Company in the ordinary course of business." The contract further provided for the release of respondent of its debt of $2,925 to appellant, and, of course, the assumption of said indebtedness by Thorsen.

The respondent purchased all of its chocolate coating requirements from the appellant until January 1, 1941, when it ceased to deal with the appellant and made its purchases elsewhere.

The granting of the judgment n.o.v. was placed on the following grounds: (1) The sale price, as described in the contract, was too indefinite, its amount being

left to the unrestricted and arbitrary determination of the seller, and that, upon a breach of the contract, an action for damages arising from loss of future profits would not lie, because of indefiniteness of the selling price; and (2) that the legal effect of the contract entered into between appellant and Thorsen on the day after the chocolate coating contract was entered into between appellant and respondent, was to change the five-year commitment for the purchase of chocolate to a period which would expire when Thorsen paid his last note, and that such was the intention of the parties.

Notwithstanding the trial court's statement in its memorandum decision that it was the intention of the parties by the second contract to change the period for which the respondent was obligated to purchase chocolate from five years until a time expiring with the payment of the last due note, the jury, in answer to a special interrogatory propounded at the instance of the respondent, stated:

"Do you find that the agreement of April 29, 1938, Ex. No. 3, was intended to and did extinguish the agreement of April 28, 1938, Ex. No. 2?  A.  No."

There was a good deal of testimony as to what the intention of appellant and Thorsen was in executing the second agreement of April 29th, and the purpose of that agreement.  We will refer to this later.  Respondent's contention that from the factual standpoint it was the intention of appellant and Thorsen to wipe out the five-year commitment in the contract of the preceding day between appellant and respondent, has been resolved adversely to respondent by the jury, and we take it that that factual question is foreclosed here.  The question presented on this appeal then is substantially one of law and not of fact.  Did the purchase contract of April 28th lack mutuality because of indefiniteness of the purchase price?

To understand better the meaning of "current price

list" as used in the contract, we quote parts of the testimony of E. E. Hemrich for the appellant company.

"Q. Referring to Plaintiff's Exhibit '2', the words 'current price list', is that the price list of the Washington Chocolate Company? A. Yes, sir. Q. Fixed by you? A. Yes, sir. Q. And changed whenever you wished, is that right? A. Yes, sir. Q. In other words, that current price referred to in that contract, Exhibit '2', could be changed today and it could be changed tomorrow? A. Yes, sir. Q. Is that right? A. Yes, sir. It could be changed. . . .

"Q. I will restate it. There is nothing in your contract with Canterbury Candy Makers or any other customer which requires you to fix the same prices for everyone of your customers for the same brand of chocolate? A. No, sir. Q. Nothing at all? A. No. . . .

"Q. Is there a different current price list for every customer? A. Yes; based upon market conditions. Q. Based upon market conditions. Now let me understand that more clearly. The current price list on April 28, 1938, to Canterbury Candy Company would be identically the same, based on market prices, to that given to, say, Imperial Candy Company? A. No. Q. Would the Imperial Candy Company be different? A. It might be. Q. On the same day? A. It might be. Q. And, say, to another candy company, the Queen Anne Candy Company, there would be a different price? A. Queen Anne might have the same price as Canterbury. Q. Now then, 'current price list' means the current price list that you give to each particular customer? A. Daily. Q. And what is the reason for the difference in the price list to each different customer? A. Depending upon the volume of business. Q. Depending upon the volume of business? A. And perhaps competitive conditions. . . .

"Q. Take 'Western Milk,' what have you got? A. Eighteen cents. Q. It says seventeen and a half cents here for Canterbury? A. Yes, sir. Q. You gave them a one-half cent discount? A. Half a cent less. Q. Everybody else paid eighteen cents? A. They paid the list price. Q. That is the list price? A. Yes, sir. Q. Everybody else paid it except Canterbury and the Imperial, and how did the Imperial and the Canterbury come within the special class? MR. EMORY: I don't

know what you are complaining about. MR. SAVAGE: I am not complaining. I am asking questions. Q. Now look at E-Z-Kote, what have you there? A. Thirteen cents. Q. It says twelve and a half here? A. That is right. Q. I hand you plaintiff's Exhibit '7', that is October 9, 1939, and I will ask you to give me—what date, the effective date? A. September 5th. Q. What is the price there? A. Seventeen. Q. And in this one of October 9, 1939, which is a month later than this one here, plaintiff's exhibit '6', look at Usar and tell us what the Canterbury was paying? A. Fourteen and a half. Q. How much under? A. Two and a half. Q. Tell the jury what the list price was on September 5, 1939, to April 15, 1940. A. The list price was seventeen cents. Q. That is the price you charged Canterbury? A. We charged fourteen and a half. Q. You charged seventeen and a half. . . .

"Q. You might do a moral wrong and make a good profit? A. Every business man has to set his selling price based on his costs. Q. You could have added three cents a pound? A. If it were justified. Q. And you could have added four cents a pound? A. Only if it justified that. Q. You decide that? A. But we must not be foolish and destroy our business."

With respect to the method employed in arriving at the prices contained in the price list, Mr. Hemrich testified on direct examination:

"Q. Now in establishing your price list, the lists which have gone in evidence as Exhibit '5,' how do you establish a price list—what elements go into the making up of the price list? MR. SAVAGE: I object as incompetent, irrelevant and immaterial. THE COURT: What is the purpose? MR. EMORY: The purpose is to show the fairness of the prices. I want to show he considered those elements which a fair seller would consider in determining a price. THE COURT: He may answer. MR. SAVAGE: Exception. THE COURT: You may have an exception. Q. Tell us how you fix up a price list and what elements you rely upon in doing it. A. We get the cocoa beans landed in Seattle and our cartage to the factory and then comes our roasting costs and our manufacturing costs and the production cost and the cartons, and then the overhead and manufacturing

costs and the production cost and the cartons, and then the overhead and manufacturing costs. Mr. Campbell usually makes it up for me, the costs on each of our items. Q. Do you work with him on making it up? A. Yes, sir."

Mr. Hemrich further testified:

"Q. What relation does a price list have to the amount or value, the prices at which goods are sold by your company to a purchaser from your company? A. It gives him a price at which he may buy. Q. Does it form the foundation for that price? A. It forms the foundation for that price."

And further:

"Q. Though there were three or four deviations from the price list, as you have testified to, the price list was still the basic price, was it not? A. Yes, sir."

■ Respondent contends that the contract lacks mutuality because the price is indefinite and solely within the discretion of appellant.

The appellant's testimony establishes that different prices were charged to different buyers and that this was done at the discretion of appellant. That they were not a market price or a definite price must, we think, be conceded.

Which test must govern the mutuality of the contract, the definiteness of the price or the fairness of the price?

We cite the case of *Weston Paper Mfg. Co. v. Downing Box Co.*, 293 Fed. 725. In this case, the plaintiff entered into an agreement to sell strawboard to the defendant. The defendant accepted some strawboard. The contract, among other things, provided: "Which price shall be the seller's market price then existing under this, the seller's standard form of quarterly price fixing contract." After the plaintiff had sold some strawboard to the defendant, the defendant then decided that the agreement was not binding because of the price provision. Quoting from the decision:

"Plaintiff asserts, and the defendant denies, the validity of a sales agreement where the 'market price' is determined, as here, by the seller. In fact it is urged that such a provision is not a 'market price' in any proper sense of the term, but is the seller's price, and brings the case squarely within the rule, announced in many cases, to the effect that an agreement which leaves the price to be fixed by the seller is too indefinite to be enforced and is void. [Citing cases]."

The court further says:

"We see nothing in this contract which takes from the seller the absolute right to fix the price in the future. Certainly defendant had no voice in fixing this price. Nor did any third party have any immediate influence upon plaintiff in determining the price. True, plaintiff may, in acting, have been governed by a desire to hold future business, or have been prompted by other laudable motives. But plaintiff could have arbitrarily changed the price each quarter, and from such arbitrary fixation defendant had no appeal. Upon the ground of uncertainty, and also for want of consideration, we conclude the agreement as drawn was unenforceable."

The case further holds that where strawboard was delivered and the plaintiff fixed the price and the defendant took the strawboard at the price fixed, then the defendant was liable for the strawboard which was delivered at the price fixed. However, the court held: "Such part performance, however, does not validate the entire agreement."

The cases cited by appellant are all clearly distinguishable from the instant case either because the actions were upon executed rather than executory contracts or because reference had been made in the contract to market prices of universal application.

In *Brooks v. Federal Surety Co.*, 24 F. (2d) 884, the court said:

"It is plain that the contract in question was a contract of sale, and not one for service. Mechem on Sales, § 43. It was executory, and no delivery of coal was ever made under it. Such a contract is not valid, unless

the price of the thing sold is determined upon by the parties themselves, either expressly or impliedly, or some means or method be agreed upon by the parties, or established by law, by which the price may be determined. Mechem on Sales, § 204. The parties to the present contract did not themselves agree upon the price of the coal sought to be sold, but they agreed that the price should be the same price (less 10 per cent) as that for which plaintiffs should sell the coal. Plaintiffs contend that this was a valid method for the determination of the price of the coal sought to be sold under the contract.

"We are constrained to disagree with this view. According to the provisions of the contract, the coal, when delivered to plaintiffs, would become their exclusive property. The mining company then would have no control over it, nor over the price for which plaintiffs might sell it. The plaintiffs would be entitled to accept any price for it satisfactory to themselves, and in effect the transaction would be the same as if the mining company had agreed to sell and deliver the coal to plaintiffs, leaving it to them alone to determine the price to be paid for it. Such an agreement lacks mutuality, and cannot be enforced."

We adhere to the rule laid down in 12 Am. Jur. 609, § 114:

"If a bilateral agreement, not originally binding on one of the parties, has been performed by him, so that the other party has actually received the promised benefit, the latter is bound to perform his promise. Where the defendant has received the consideration of an agreement, it is no answer for a breach of the same that the agreement did not bind the plaintiff. Moreover, the fact that a bilateral agreement was not binding while wholly executory because both parties were not bound is not controlling where the parties have acted under it during the entire period of its existence, but under such circumstances it cannot be questioned and must to such extent control and measure the rights of such respective parties.

"The rule that the promise to be sufficient consideration must be binding requires it to be lawful, definite, and possible."

Since this is completely decisive of the case, the other issues in the case will not be commented upon.

The judgment is affirmed.

MILLARD, STEINERT, and JEFFERS, JJ., concur.

SIMPSON, C. J., concurs in the result.

[1] Reported in 138 P. (2d) 181.