[No. 44660. En Banc. November 16, 1978.]

SNOHOMISH COUNTY PUBLIC UTILITY DISTRICT NO. 1, *Respondent,* v. BROADVIEW TELEVISION COMPANY, ET AL, *Appellants.*

4

*Riddell, Williams, Ivie, Bullitt & Walkinshaw, Stimson Bullitt,* and *W. Michael Hafferty,* for appellants.

*Williams, Novak & Hansen, P.S., Edward D. Hansen,* and *James D. Twisselman,* for respondent.

ROSELLINI, J.—In this action to recover unpaid charges for the use of the respondent's utility poles, summary judgment was granted against the appellants. The Superior Court found that there was no disputed issue of material fact and that the affirmative defenses were insufficient to relieve the appellants of liability.

The respondent is engaged in the distribution and sale of electrical energy in Snohomish County, pursuant to RCW Title 54. It licenses the use of pole space not required for its own purposes to various parties, among whom are the appellants. The rates charged are uniform. The conditions of such licenses are spelled out in some detail in written agreements which contain the following provision with regard to rates:

> By giving six (6) months' notice to Licensee [appellants], Licensor [respondent] may from time to time

increase or decrease the rates specified in (b) of this section effective as of the date on which the semi–annual payment hereinabove provided for is to be computed next following the expiration of said six (6) months. If such changed rates are not acceptable to Licensee, Licensee may terminate this Agreement as hereinafter provided.

The agreement provides that the licensee may terminate the agreement by removing its cables from the licensor's utility poles.

When the appellants first attached their television cables to the respondent's poles in 1966, the annual rental charge per pole attachment was $3.60 in cases where the respondent was the sole owner of the pole. These rates remained in effect until 1973, when the respondent notified its licensees that, due to rising costs, the rates would be increased. The amount eventually settled upon was almost twice the amount previously charged. The appellants protested these charges as unreasonable and refused to pay any amount above the original rate. They did not, however, exercise their option to remove their cables from the respondent's utility poles.

The appellants maintain that the Superior Court erred in holding that the respondent had complete discretion, under the contract and under the law, to set the rates at which it would license the use of its utility poles and that its decision in this regard was not subject to judicial review. It is first suggested that the rates are reviewable under RCW 54.24.080, which provides:

The commission of each district which shall have revenue obligations outstanding shall have the power and shall be required to establish, maintain, and collect rates or charges for electric energy and water and other services, facilities, and commodities sold, furnished, or supplied by the district which shall be fair and nondiscriminatory and adequate to provide revenues sufficient for the payment of the principal of and interest on such revenue obligations for which the payment has not otherwise been provided and all payments which the district is obligated to set aside in any special fund or funds created

for such purpose, and for the proper operation and maintenance of the public utility and all necessary repairs, replacements, and renewals thereof.

■ It is the theory of the appellants that the legislative purpose expressed in this section was to restrain a public utility district from setting rates which are unfairly high from the user's or licensee's viewpoint, as well as those which are unfairly low from the bondholder's viewpoint. We cannot agree with this interpretation. The section is found in the chapter dealing with the financing of the acquisition or construction of utility district facilities, particularly with regard to the sale of bonds.

The security of the obligation to bondholders was the subject of special legislative attention. In RCW 54.24.050, it is provided that, in creating a special fund pledged as security for the repayment of bondholders, a resolution of the district may contain various covenants, among which is a covenant to establish and maintain adequate rates and charges. RCW 54.24.080 is obviously designed to further this same purpose, that of protecting the bondholder's security. By its terms, the provision has viability only so long as there are revenue obligations outstanding. If the legislature had intended to protect users and licensees against unreasonably high rates, it would surely not have confined that protection to periods when a district is laboring under the financial burden of bond obligations, but would have afforded it also when there is no such obligation outstanding and when the district would be in a better position to lower its rates.

Furthermore, to construe the provision as creating in the licensee or user a right to challenge the reasonableness of rates charged would be to read into it a provision inconsistent with the legislative intent as expressed in RCW 54.16-.040. That section reads:

A district may purchase, within or without its limits, electric current for sale and distribution within or without its limits, and construct, condemn and purchase, purchase, acquire, add to, maintain, conduct, and operate

works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam, or other methods, within or without its limits, for the purpose of furnishing the district, and the inhabitants thereof and any other persons, including public and private corporations, within or without its limits, with electric current for all uses, *with full and exclusive authority to sell and regulate and control the use, distribution, rates, service, charges, and price thereof, free from the jurisdiction and control of the utilities and transportation commission, in all things,* together with the right to purchase, handle, sell, or lease motors, lamps, transformers and all other kinds of equipment and accessories necessary and convenient for the use, distribution, and sale thereof:

(Italics ours.)

 The general legislative purpose expressed in this section is to relieve a public utility such as the respondent from any obligation to justify its rates for service before a reviewing body of any kind. We conclude this from the fact that such districts are exempted from the jurisdiction and control of the Washington State Utilities and Transportation Commission. Since detailed procedures for hearings before the commission and for judicial review of its orders are provided in RCW 80.04, and these provisions apply to public utilities generally, it is obvious that the legislature, if it thought it necessary or desirable to provide for review of charges imposed by such utilities as these, would have subjected them to the requirements of this chapter. Furthermore, a right to obtain review, whether judicial or administrative, would defeat the grant of "full and exclusive" authority to control rates, charges, and prices.

That grant is indeed modified by RCW 54.24.080, which imposes a duty to charge rates which will protect the interest of the bondholders, so long as bonded indebtedness is outstanding. As the appellants would have us interpret that section, it nullifies completely the grant of "full and exclusive authority" to the district, making its rates subject to judicial review upon complaint of any user or licensee.

Statutes pertaining to the same subject matter must be harmonized, if possible. *State v. Fairbanks,* 25 Wn.2d 686, 171 P.2d 845 (1946). If RCW 54.24.080 is construed as only a partial limitation on the authority granted in RCW 54.16.040, carved out for the protection of bondholders only, the integrity of both is preserved. Such an interpretation, we find, accords with the expressed legislative intent.

While, arguably, RCW 54.24.080 is broad enough in its language to cover charges for the use of utility property, the "full and exclusive authority" to control rates, charges, and prices, without interference by the Utilities and Transportation Commission, under RCW 54.16.040, is given with reference to the furnishing of electric current to the district's inhabitants and others. The right to "purchase, handle, sell or lease" equipment and accessories necessary and convenient for the use, distribution and sale thereof, although it is accompanied by no statutory limitations or conditions, is not expressly made "full and exclusive" nor exempted from the jurisdiction of the commission.[1] Evidently the legislature considered such express exemption unnecessary, since these activities are only incidental to the accomplishment of the district's primary purpose, the distribution and sale of electricity. If such a utility is not within the jurisdiction of the commission with respect to that purpose, it is not subject to its jurisdiction with respect to such an incidental and optional transaction as that involved here.

We find in the statutes regulating public utility districts no expression of a legislative purpose to expose to judicial review a district's decision with respect to the rates which it will charge for use of pole space.

We should observe in passing that we do not think the legislature, in exempting public utility districts from the

---

[1]While the parties are agreed that the respondent had the authority to license the use of pole space to users such as the appellants, that authority is not expressly conferred in the act. It can be inferred from the language of RCW 54.16.040. However, there are statutory restrictions upon the power of a district to sell or lease its property. *See* RCW 54.16.180.

control of the Utilities and Transportation Commission and giving them plenary authority to set rates and charges, was manifesting a disregard for the interests and rights of customers of such utilities. Rather, it would appear that it had in mind the nature of such utilities, which are formed by the voters of the district and whose commissioners are likewise elected. RCW 54.08. The facts that the district is publicly owned and operated and that it has no profit motive[2] offer reasonable assurance that excessive charges for utility services will not be imposed. The legislature may well have concluded, also, that to subject a publicly owned utility's rate determination function to the jurisdiction of the commission and the courts would impose upon it burdens which would outweigh any benefits to users that such review might provide.

It is not suggested that the legislature lacked the constitutional power to deny to persons contracting with a public utility district the right to challenge its charges in court, and we conclude that this was its intent.

The appellants cite a number of cases holding that, where a public agency exercises a monopoly in the furnishing of a utility service, the rates which it charges its customers must be fair and nondiscriminatory. These monopolies are, of course, governmentally sanctioned, and it is the function and duty of the agency to make its services available to all the inhabitants in the area in which it operates. Were the defendants customers of the respondent, purchasing the electrical energy which it is its function to supply, those cases would have relevance. Whether they would be controlling in spite of the broad grant of authority found in RCW 54.16.040, we need not decide.

There is no showing that the respondent has any duty to furnish pole space to the public generally, or to any person.

---

[2]The object of municipal ownership is to give the citizen the best possible service at the lowest possible price. *Uhler v. Olympia,* 87 Wash. 1, 151 P. 117, 152 P. 998 (1915). The control which is exercised by those in charge of a public utility district must be for the benefit of the users of the electricity. *Carstens v. PUD 1,* 8 Wn.2d 136, 111 P.2d 583 (1941).

Nor are we shown that it has a protected monopoly of poles in the county. The appellants have a franchise to operate in the county and they tacitly concede that the franchise grants them the right to erect poles and string cables on them or to lay the cables underground. They simply do not find either of these courses of action economically feasible. But they cite to us no authority which holds that because they find it convenient and desirable to use the respondent's property in the pursuit of their enterprise, the respondent is duty bound to make that property available to them. No statute imposes such a duty on the respondent nor are we made aware of any principle of common law which would do so.

■ As the Superior Court recognized, the case of *Baxter–Wyckoff Co. v. Seattle,* 67 Wn.2d 555, 408 P.2d 1012 (1965), states the principle which defines the respondent's duty with respect to parties in the position of the appellants. In that case the plaintiffs, a wood processing company and a lumber company, had, with the city's permission, erected structures on land dedicated as a public street. The city exacted an annual fee for this privilege, and the plaintiffs sought to enjoin the collection of the fees, contending, much as the appellants contend here, that they bore no reasonable relation to costs associated with the plaintiffs' use of the property and were in fact revenue-raising charges. They maintained that they had a right to use the streets for their purposes, so long as the street was not developed as such and their occupation of it did not interfere with public use.

Noting the rule that there is no inherent right in a private individual to conduct private business in the public streets, we quoted the following from *Hadfield v. Lundin,* 98 Wash. 657, 168 P. 516 (1917).

> The streets and highways belong to the public. They are built and maintained at public expense for the use of the general public in the ordinary and customary manner. The state, and the city as an arm of the state, has absolute control of the streets in the interest of the

public. No private individual or corporation has a right to the use of the streets in the prosecution of the business of a common carrier for private gain without the consent of the state, nor except upon the terms and conditions prescribed by the state or municipality, as the case may be. The use of the streets as a place of business or as a main instrumentality of business is accorded as a mere privilege and not as a matter of natural right.

*Baxter–Wyckoff Co. v. Seattle, supra* at 560.

The permit granted by the city, we said, was a mere privilege, which the city could grant or withhold in its discretion, and if it granted the privilege, it could impose such terms and conditions as it saw fit. The courts have never taken it upon themselves to review the appropriateness of conditions imposed on such a privilege nor to substitute their judgment for that of the municipal authorities. The power of the city is plenary over its property.

This case differs from *Baxter–Wyckoff* in that the municipal corporation here is a public utility district rather than a city, and the public property which the appellants claim a right to use is a series of telephone poles owned by the utility, rather than a street. These are not material differences. As a municipal corporation, the respondent is an agency of the state and its property belongs to the public, just as do a city's streets. Private parties have no more right to use the respondent's poles for their private purposes than they have to appropriate the public streets to their own use. That being the case, assuming the respondent's authority to permit the use of pole space (which the appellants do not question), it is entitled to grant the privilege upon such terms and conditions as it sees fit. This does not mean that the legislature may not restrict or regulate the right, but it has not yet found occasion to do so.

The appellants cite *Spokane v. Spokane Gas & Fuel Co.*, 175 Wash. 103, 26 P.2d 1034 (1933), and contend that it supports their position here. There the city had granted a franchise to lay pipelines in its streets for the distribution of gas. In granting the franchise, the city retained the

power to fix rates for gas, "said rates so established to be reasonable rates." The franchise fixed the charge to be paid by the gas company at two percent of its gross receipts, and provided that, after 25 years, the percentage should be fixed at the same time as the rates to be charged customers.

Three years after the expiration of the initial term of the franchise, the city passed an ordinance continuing the charge at 2 percent of the company's gross receipts. The company resisted payment, and the city brought suit to collect the amount then due, alleging that the rate was reasonable. By way of affirmative defense, the gas company alleged that the rate was unreasonable and arbitrary.

The superior court gave judgment for the city, holding that it had the right to fix the charge and was not required to defend its reasonableness. This court reversed. While recognizing that a city is not obliged to grant a franchise and, if it does so, may grant it on its own terms and conditions, it held that once the franchise was granted, it became a contract between the city and the gas company. While the rationale of the opinion is vague, the court appears to have concluded that, under the terms of the contract, the city was obliged to establish a reasonable rate. No such obligation can be found in the contract between the parties here. There were also, in that case, equitable factors not present here. Estoppel is not one of the defenses advanced by the appellants.

That case does not stand for the proposition that a municipality may not, by contract, retain the right to determine the rates which it will charge for future use of its property.

Since the respondent had the right to fix the charges which it would exact for use of its poles (*Baxter–Wyckoff Co. v. Seattle, supra*), the agreement, under the terms of which the respondent expressly retained the right, was not illegal or violative of public policy.

The appellants argue, nevertheless, that the agreement was too indefinite to enforce. If this were the case, and we do not agree that it is, the appellants would be unable to

claim any rights under it. Implicit in all of their arguments is an assumption that they have a right to use the respondent's utility poles. Since they are not given that right by statute, if it exists at all it exists only by the terms of a contract which they suggest is unenforceable. If the contract is in fact void, then neither party can claim rights under it.

*Washington Chocolate Co. v. Canterbury Candy Makers, Inc.,* 18 Wn.2d 79, 138 P.2d 195 (1943), relied upon by the appellants, illustrates the point. There the parties had agreed that the defendant would purchase all of its requirements for chocolate coatings from the plaintiff, for a period of 5 years, at the plaintiff's "current list price". Before the expiration of the 5–year term of the contract, the defendant repudiated it and purchased its chocolate requirements elsewhere. The plaintiff seller brought a suit for damages for lost profits, resulting from the alleged breach by the buyer. Finding that because there was no objective standard by which the "current list price" could be determined, the setting of the price was entirely within the discretion of the seller, we held the contract too indefinite to enforce.

At the same time, we recognized the rule that where the buyer has accepted delivery under such a contract, after the seller has fixed the price, the buyer is bound to pay that price, even though he is not obliged to accept future deliveries. *Weston Paper Mfg. Co. v. Downing Box Co.,* 293 F. 725 (7th Cir. 1923) was cited. This rule is also found in *Platts v. Arney,* 46 Wn.2d 122, 278 P.2d 657 (1955), *Christofersen v. Radovich,* 23 Wn.2d 846, 162 P.2d 830 (1945), and *McDougall v. McDonald,* 86 Wash. 334, 150 P. 628 (1915). The principle is that a contract which has been partially performed, even though it may be too indefinite to enforce in an action for specific performance, or to support a recovery of damages for failure to perform, is enforceable to the extent that performance has made its terms certain.

The agreement signed by the parties to this action is drawn in conformance with that principle. While the

respondent retains the right to change the rates to be charged for use of its poles, no change can be made without prior notice to the appellants, giving them the opportunity to remove their cables if they do not desire to pay the price. In other words, they are not bound to use the respondent's poles, but if they do so, they are bound to pay the appellants' previously set price for such use.

Under the terms of this contract, there was no time at which the rate to be paid by the appellants for their present use of the pole space was indefinite. A rate was set at the initiation of the contract, and that rate continued until the appellants were given notice that it would be changed at the time provided in the contract. Thus, while the appellants use this pole space, they are always aware of the price which they are being charged for it. Under their agreement, they have contracted to pay that price, whether or not they regard the price as reasonable.

As the rule is stated in 17 Am. Jur. 2d *Contracts* § 465 (1964), where a change is made pursuant to a contractual provision therefor, the contract as so changed is as completely voluntary and consensual as was the original contract.

It is claimed that the Superior Court erred in striking as insufficient the appellants' third and sixth affirmative defenses alleging violations of federal law, insofar as those defenses were based upon the antitrust laws, and in granting summary judgment with respect to them.

The lower court grounded its decision upon the theory that the respondent's participation in the transaction in question constituted "state action", which the United States Supreme Court in *Parker v. Brown,* 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943), has declared to be exempt from the restrictions of federal antitrust statutes. The holding of that case has been limited somewhat in the recent decision of *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 413, 55 L. Ed. 2d 364, 98 S. Ct. 1123 (1978). There a sharply divided court held that the *Parker* doctrine does not exempt all municipal activities but does

exempt "anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service."

██ The latter case had not been decided when the briefs were submitted in this case and, consequently, they do not discuss it. We do not find it necessary to explore the question whether the licensing agreement involved here fits within the category described in that opinion. The lower court's decision can be sustained upon another ground, which was considered by the court and argued here. The United States Supreme Court, in interpreting the Sherman Act and the Clayton Act[3] has repeatedly said that in enacting these laws, it was not the intent of Congress to afford a party a means of escaping his liability under an otherwise valid contract. *Kelly v. Kosuga,* 358 U.S. 516, 3 L. Ed. 2d 475, 79 S. Ct. 429, *rehearing denied,* 359 U.S. 962, 3 L. Ed. 2d 769, 79 S. Ct. 796 (1959); *Bruce's Juices, Inc. v. American Can Co.,* 330 U.S. 743, 91 L. Ed. 1219, 67 S. Ct. 1015 (1947); *D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co.,* 236 U.S. 165, 59 L. Ed. 520, 35 S. Ct. 398 (1915); *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 46 L. Ed. 679, 22 S. Ct. 431 (1902). As the Second Circuit noted in *Viacom Int'l, Inc. v. Tandem Prods., Inc.,* 526 F.2d 593 (2d Cir. 1975), the Supreme Court, in this series of cases, has expressed antipathy towards the interposition of antitrust defenses in contract actions. Only if the contract itself involves a violation is such a defense permitted. In *Continental Wall Paper Co. v. Louis Voight & Sons,* 212 U.S. 227, 53 L. Ed. 486, 29 S. Ct. 280 (1909), the United States Supreme Court found that the contract itself was an intrinsically illegal element in a scheme for which the manufacturers involved had combined. *See also Bement & Sons v. National Harrow Co.,* 186 U.S. 70, 46 L. Ed. 1058, 22 S. Ct. 747 (1902).

---

[3]15 U.S.C. §§ 1, 2, and 13 (1976) were cited to the court below as the statutes upon which these federal law defenses were based.

The Supreme Court stated in *Bruce's Juices, Inc. v. American Can Co., supra* at 755:

> [W]here a suit is based upon an agreement to which both defendant and plaintiff are parties, and which has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought, the Court will entertain the defense that the contract in suit is illegal under the express provision of that statute. *Continental Wall Paper Co. v. Louis Voight and Sons Co.*, 212 U. S. 227 [53 L. Ed. 486, 29 S. Ct. 280 (1909)]. . . . But when the contract sued upon is not intrinsically illegal, the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act not inhering in the particular contract in suit and has reaffirmed the "doctrine that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.'"

Other considerations supporting the view that antitrust defenses should be discouraged in contract actions are found in the Second Circuit's opinion in *Viacom.* Such defenses, the court said there, citing an opinion of the First Circuit in *Dickstein v. duPont,* 443 F.2d 783 (1st Cir. 1971), would tend to prolong and complicate contract disputes and thus convert a facially simple litigation into one involving the complexities of antitrust law. Further, an easy toleration of such defenses to contract actions would threaten to involve parties claiming under the contract to litigation so protracted and expensive that they might be coerced into unsatisfactory settlements or be compelled to forego any prosecution of their claims. The court said that it is well known that the litigation of antitrust issues is more likely to involve lengthy and expensive proceedings both before trial and at trial, than any other kind of federal court litigation.

These considerations are especially noteworthy in a case such as this, where the respondent is simply seeking to recover charges imposed for the use of its poles under a

contract which the appellants concede that it had the authority to enter into, and which they do not claim was in and of itself violative of federal law. Even though the respondent obtained summary judgment against these appellants, a lengthy pretrial preparation had already materialized, involving proceedings in both federal and state courts. The clerk's papers number 954 pages. Even so, the factual basis for the appellants' antitrust contentions has not yet been defined.

There are, in the federal court pleadings, allegations that the respondent combined and conspired with others to eliminate competition in the cable industry, to restrict the appellants from obtaining access to public utility poles and to coerce them to pay arbitrary, unfair and monopolistic rates; that it discriminated between them and users of poles in other parts of the United States;[4] and that it engaged in a continuing course of unlawful and coercive conduct with intent to monopolize, restrain and lessen interstate trade and commerce in various areas of the communications field. The development of factual evidence to support these conclusory allegations would indeed convert this action from one upon a simple contract to a full–blown antitrust suit, with all the delay, vexation, and expense which are involved in such litigation. Of course, this is not a controlling consideration, but it augurs in favor of the policy which relegates a party claiming antitrust law violations to his statutory remedies and denies him the right to rely upon such alleged violations as a means of escaping his obligations under an ostensibly valid contract.

Inasmuch as the violations claimed by the appellants do not inhere in the contract itself but are collateral to it, involving as they do persons not parties to the contract and activities outside its intended scope, they did not constitute

---

[4]Notably absent was any allegation that the respondent discriminated in favor of other users of its own poles. The respondent's uncontroverted affidavits showed that it licensed pole space to 22 additional users, all of whom were charged and paid the same rates.

a valid defense to a suit for payment for benefits admittedly received under the contract. The Superior Court did not err in dismissing the defenses based upon federal antitrust legislation.

Since we have concluded that under federal law antitrust violations cannot be asserted as a defense to the contract, we avoid the question whether federal courts have exclusive jurisdiction of actions under these statutes. *See First Nat'l Bank v. Jones,* 48 Ill. 2d 282, 269 N.E.2d 494 (1971); *Vaughn & Co. v. Saul,* 143 Ga. App. 74, 237 S.E.2d 622 (1977); *Harold Butler Enterprises #97, Inc. v. Vanlandingham,* 264 Ore. 414, 505 P.2d 1149 (1973). *And see* ALI, *Study of the Division of Jurisdiction Between State and Federal Courts* § 1131(b) (1968).

Likewise, we need not decide whether the transaction between the parties to this suit was one which had an effect upon interstate commerce sufficient to bring it within the purview of the federal statutes relied upon.

It is next contended that the lower court erred in denying appellants leave to take further oral discovery of a consultant hired by the respondent. It was hoped by this procedure to obtain evidence with respect to the question of reasonableness of the rates charged by the respondent. Since the respondent was not obliged to defend the reasonableness of the charges made pursuant to the contract, error, if any, in limiting discovery upon this issue was harmless.

Error is assigned to the court's action in awarding attorney fees to the respondent. The contract provided:

> If the District should bring any suit, action or other legal proceedings against the Licensee, it shall be entitled to [recover], in addition to any judgment or decree for costs, such reasonable attorney's fees as it may have incurred in such suit, action or other legal proceedings.

RCW 4.84.010 recognizes the right to contract for the payment of attorney fees. The appellants concede that if the contract is enforced as originally written, it is obliged to pay the respondent reasonable fees. Since the contract was

valid and enforceable, the award was properly made. It is suggested that part of the award was in excess of an amount agreed to by the parties. However, the references to the record do not establish the existence of such an agreement, and the presumption of correctness attaching to trial court rulings must prevail.

The judgment is affirmed.

WRIGHT, C.J., and HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.