**ACKERLEY MEDIA GROUP, INC., Plaintiff,**

v.

**SHARP ELECTRONICS CORP., Defendant.**

**No. 01 Civ. 4135(CBM).**

United States District Court, S.D. New York.

Nov. 9, 2001.

Jeffrey Harris, Rubin, Winston, Diercks, Harris & Cooke, L.L.P. Washington, DC, for plaintiff.

David S. Versfelt, Kirkpatrick & Lockhart LLP, New York, NY, for defendant.

### MEMORANDUM OPINION AND ORDER

MOTLEY, District Judge.

## I. INTRODUCTION

This is a diversity breach of contract action brought by plaintiff Ackerley Media Group, Inc. ("Ackerley") against Sharp Electronics Corporation ("Sharp"). Ackerley, a Washington corporation with principal place of business in Seattle, Washington, handles the in-arena advertising for the Seattle Supersonics NBA basketball team ("Sonics"). Sharp, a New York corporation with principal place of business in Mahwah, New Jersey, is a manufacturer of electronics goods.

Ackerley filed its complaint on May 16, 2001. In lieu of an answer, Sharp filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Following briefing by both parties, the court heard oral argument on Sharp's motion on October 16, 2001. At the close of oral argument, the court issued an Order from the bench denying Sharp's motion. This opinion sets forth the reasons for that Order.

## II. FACTUAL BACKGROUND

Ackerley claims that it had a three season (1998–1999 through 2000–2001) adver-

tising contract with Sharp and that Sharp failed to pay for the 2000–2001 season. Sharp claims that the agreement was a valid contract only for the first year (1998–1999) and an unenforceable "agreement to agree" for the following NBA seasons (1999–2000 and 2000–2001). Sharp also maintains that the complaint must be dismissed because Ackerley failed to plead its performance with sufficient particularity.

When passing on a Rule 12(b)(6) motion to dismiss, the court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The court may also consider any documents upon which plaintiff undeniably relies and which are integral to its claims. *See Int'l Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.1995). The following exposition of the facts is therefore based on (i) the allegations contained in Ackerley's complaint; (ii) the terms of the "Team Sponsorship Agreement" ("TSA") which forms the purported contract upon which Ackerley sues (*see* Compl. ¶ 13; Def.'s Mem. Ex. 1); (iii) the terms of the "1999–2000 Seattle SuperSonics Letter of Intent" (*see* Compl. ¶¶ 13, 16; Def.'s Mem. Ex. 2); and (iv) the terms of the "1999–2000 Seattle SuperSonics Contract Addendum" (*see* Compl. ¶¶ 13, 16; Def.'s Mem. Ex. 3).

On or about August 1, 1998, Ackerley and Sharp entered into a written agreement–the TSA–whereby Ackerley would provide Sharp with in-arena advertising at the Sonics' home basketball games in consideration of the payment to Ackerley by Sharp of the amounts set forth in the agreement. Ackerley also agreed to provide Sharp with certain other fringe-type benefits such as four free tickets to each game, a parking space, one night in a VIP luxury suite, recognition in a printed program, and the right to purchase non-reserved tickets prior to the general public.

Paragraph 1 of the TSA provides that:

**1.** **Terms of Agreement**

a. This Agreement shall commence on August 1, 1998 and all rights herein shall terminate immediately upon the conclusion of the last game played by the Seattle Supersonics in the 2000–2001 NBA season.

b. [Sharp] shall have the right to seek the renegotiation and extension of the terms of its Sponsorship of the Sonics, provided that agreement terms are met by April 30, 2001. If agreement terms are not agreed upon by said date, Sonics may solicit competitive bids.

c. [Sharp] shall have the option to terminate sponsorship agreement at the conclusion of the 1998–1999 and 1999–2000 NBA seasons. [Sharp] agrees to submit termination request in writing on or before April 30, 1999 and April 30, 2000 respectively for termination request to be honored.

With respect to price, paragraph 7 of the TSA states:

**7.** **Sponsorship Fee**

a. Annual Fee: In consideration for the rights granted herein, [Sharp] shall pay to Sonics the annual Sponsorship Fee which shall be as follows:

| NBA Season | Annual Sponsorship Fee |
| --- | --- |
| 1998–1999 | $144,200 gross / $122,570 net |
| 1999–2000 | $144,200 gross / $122,570 net plus an additional amount not to exceed 6% of previous season contract total. Such exact amount to be mutually agreed upon by both parties. |
| 2000–2001 | 1999–2000 contract amount plus an additional amount not to exceed 6% of previous season contract total. Such exact amount to be mutually agreed upon by both parties. |

Ackerley and Sharp each fully performed according to the terms of the TSA for the 1998–1999 season.

For the 1999–2000 NBA season, the parties executed a "Letter of Intent" on August 18, 1999, followed by a "Contract Addendum" dated December 2, 1999. That Addendum fixed the price for the 1999–2000 season at $146,363 gross / $124,408 net. Both sides fully performed according to the terms of the Addendum.

Sharp failed to send Ackerley written notice of termination of the TSA for the 2000–2001 NBA season. Ackerley subsequently fully performed its obligations under the TSA for the 2000–2001 season.

Sharp failed to pay Ackerley for the 2000–2001 season, and Ackerley is now suing Sharp for $144,200–the TSA's gross price for the 1998–1999 season. Ackerley also seeks attorneys' fees to which it is entitled under the terms of the TSA.

Another relevant section of the TSA concerns choice of law and forum:

**16. Governing Law: Venue**

This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Washington. The appropriate state and federal courts located in King County, Washington shall have jurisdiction of all matters arising under this agreement and will be the forum in which to adjudicate such matters.

The TSA also contains an integration clause and a requirement that any amendment be in writing.

## III. DISCUSSION

Defendant Sharp asserts two arguments why plaintiff has failed to state a claim: (1) there was no valid contract for the 2000–2001 season since the TSA failed to specify price, a material term; and (2) there are no specific allegations that plaintiff Ackerley performed during 2000–2001. Before the court can delve into the merits of these contentions, the court must address a choice of law issue.

### A. Choice of Law

■ Defendant Sharp argues that New York rather than Washington state law should apply because "New York is the forum chosen by Ackerley for bringing this action." Def.'s Mem. at 4 n. 3. According to Sharp, since the purported 2000–2001 agreement is not a valid and binding contract, "there is no agreement of the parties to resolve their dispute under Washington [s]tate law." Def.'s Reply Mem. at 2. According to Sharp, since the parties are in a federal court in New York, the court should look to New York law to determine whether the TSA was a valid contract. Sharp, however, cites no authority in support of its position.

Plaintiff Ackerley argues that the TSA's choice of law clause is controlling on this point. According to Ackerley, given "the parties' choice of Washington law to govern their contract," the court must look to Washington law to determine the validity of that contract. Pl.'s Mem. at 4. The problem with Ackerley's argument is that it *presumes* that the TSA is a binding contract. If, as Sharp argues, the TSA is not a valid and binding contract, then the relevance of the choice of law clause becomes immediately suspect. Morever, even assuming that the parties intended to be bound by Washington law, their express choice of law is not necessarily determinative. *See Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.1984) ("[S]uch provisions are not controlling and may be disregarded where the most significant contacts with the matter in dispute are in another State."). As explained below, the court need not even consider the parties' purported choice of Washington law to conclude that Washington law does, in fact, govern.

As an initial matter, the only significance to be given to the fact that plaintiff

brought suit in this district is that New York choice of law rules will apply. *See Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). As explained below, under New York choice of law rules, the validity of the contract must be determined by looking to Washington state law.[1]

The choice of law rules in contract disputes are hardly paragons of clarity. *See, e.g.,* 17 C.J.S. Contracts § 13 (1999) ("There is some conflict and confusion in the cases dealing with the determination of the law governing contracts."); *see also Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 n. 5 (2d Cir.1997) ("[C]ourts often appear to be confused as to whether New York courts apply the same choice of law rules to tort claims and contract claims."). *Compare Allstate Ins. Co. v. Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 943–45 (1993) (Hancock, J., dissenting) (characterizing majority's choice of law analysis as "outmoded" and "contrary" to settled law), *with id.* at 940 (arguing that dissent "confuses" choice of law rules in contract disputes with those in tort cases). To make things as simple as possible for the case at bar, rather than complicating the issue by trying to fathom the significance of the TSA's choice of law clause, the court will first determine which state's law would apply in this dispute if the TSA did *not* have a choice of law clause.

The New York Court of Appeals has explained that, under the traditional choice of law rules concerning contracts,

> where the parties have not expressed their choice of law in their agreement[,] matters bearing upon the execution, interpretation, and validity of contracts are determined by the law of the place where the contract is made while matters concerned with the performance are regulated by the law of the place where the contract, by its terms, is to be performed.

*Intercont'l Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576, 581 (1969) (citing early twentieth-century cases). This traditional view still weighs heavily in New York courts. For example, in *Recovery Consultants, Inc. v. Shih–Hsieh,* 141 A.D.2d 272, 534 N.Y.S.2d 374 (1988), the New York Appellate Division opined that "[a]s a general rule, the validity of a contract is determined by the law of the jurisdiction where the contract is made." *Id.* at 375; *see also Keywell Corp. v. Weinstein,* 33 F.3d 159, 163 (2d Cir.1994) ("While the parties chose Maryland law to govern their contract, they do not dispute that questions concerning the *validity* of the contract should be determined by the law of the jurisdiction in which it was made." (original emphasis)) (citing *Recovery Consultants,* 534 N.Y.S.2d at 375). A contract was deemed "made" in the jurisdiction where "the last act necessary to make it binding takes place according to the law of contracts." *Intercont'l Planning,* 300 N.Y.S.2d 817, 248 N.E.2d at 581.

In *Intercontinental Planning,* however, the New York Court of Appeals appears to

---

1. As explained above, *see supra* Part II, for purposes of this motion to dismiss, the court assumes the veracity of all of plaintiff's allegations. The choice of law analysis which follows is therefore based on these assumed facts. The discovery process might very well uncover other facts which would then force the court to revisit the choice of law issue at the summary judgment or trial phase of this litigation.

have jettisoned this traditional view in favor of "an approach which 'gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation.' " *Intercont'l Planning,* 300 N.Y.S.2d 817, 248 N.E.2d at 581 (quoting *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99, 102 (1954)). Thus the Appellate Division, in passing on the validity of an oral contract made in England, has held in another case that "[i]n determining the law applicable to matters bearing upon the execution, interpretation, validity and performance of a contract, the modern approach is to apply the law of the jurisdiction having the greatest interest in the litigation." *Spink & Son, Ltd. v. Gen. Atl. Corp.,* 167 Misc.2d 120, 637 N.Y.S.2d 921, 922 (1996). Federal courts interpreting New York law have come to similar conclusions. *See, e.g., Alderman v. Pan Am World Airways,* 169 F.3d 99, 103 (2d Cir. 1999) ("Under New York's choice of law rules, the interpretation and validity of a contract is governed by the law of the jurisdiction which is the 'center of gravity' of the transaction.") (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539–40 (2d Cir.1997)). This "center of gravity" analysis has also been referred to as a "grouping of contacts" analysis. *See Lazard Freres,* 108 F.3d at 1539; *Stolarz,* 597 N.Y.S.2d 904, 613 N.E.2d at 939. In determining the validity of the contract in *Spink,* the Appellate Division conducted a "grouping of contacts" analysis using the factors outlined in section 188 of the Restatement (Second) of Conflict of Laws: "[W]hen determining choice of law the 'five generally significant contacts in a contract case [are]: the place of contracting, negotiation and performance; the location of the sub-

ject matter of the contract; and the domicile of the contracting parties.' " *Spink,* 637 N.Y.S.2d at 923 (quoting *Stolarz,* 597 N.Y.S.2d 904, 613 N.E.2d at 940).

In the case at bar, if the court were to rely on the traditional view of choice of law rules, it would have to inquire where the contract was purportedly finally "made," *Intercont'l Planning,* 300 N.Y.S.2d 817, 248 N.E.2d at 581, i.e., the place where the second signature was affixed. *See, e.g., Max Factor & Co. v. Janel Sales Corp.,* 298 F.2d 511, 512 (2d Cir.1962) (per curiam). The complaint, however, makes no allegation as to when or where the TSA was signed by each party, and the place of execution is not explicitly indicated on the face of the document. In any event, this court rejects such an antiquated approach to the choice of law question–which nevertheless still seems to linger in cases such as *Recovery Consultants* and *Keywell Corp.*– for as one panel of the Second Circuit has (somewhat optimistically) noted, "New York has rejected this slavish adherence to the traditional [view]." *Lazard Freres,* 108 F.3d at 1540 n. 7.

So, turning to the modern "grouping of contacts" analysis and factors articulated in *Stolarz,* it becomes clear that Washington law should be applied to determine the validity of the TSA. First, as for the place of contracting, as indicated above the TSA does not explicitly state where it was executed, nor does the complaint contain any allegation as to the place of contracting. The TSA, however, is printed on Ackerley (d/b/a Full House Sports & Entertainment) letterhead, with a Seattle, Washington, address clearly printed on it. In the absence of evidence to the contrary, the court will therefore assume that the TSA was executed in Washington. Second, as for negotiation and performance, the complaint is devoid of any allegations concerning where the contract was negotiated. It

is eminently clear, however, that the TSA was to be performed in Washington; Ackerley was to provide in-house advertising at the Seattle Sonics home basketball games. Likewise, as for the third factor, the subject matter of the TSA was obviously in Washington. Finally, as to the domicile of the parties, Ackerley is a Washington corporation with principal place of business in Washington, and Sharp is a New York corporation with principal place of business in New Jersey. Balancing all of these factors, the court can only conclude that Washington law governs questions concerning the validity of the TSA.

As for the TSA's choice of law clause, since the court concludes that Washington law would govern in the absence of such a clause, and since the clause itself identifies Washington law as controlling, the court need not inquire as to the effect of the clause. The court does note, however, some of the justifications provided by the New York Court of Appeals for rejecting the traditional rules: "These inflexible rules proved unsatisfactory because the location of the controlling event was sometimes fortuitous, *did not reflect the parties' intentions,* or was insignificant as against the location of other events." *Allstate Ins. Co. v. Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 938 (1993) (emphasis added). As Sharp admits, the TSA and its choice of law clause governed the parties' relationship for the 1998–1999 season and, by extension, the 1999–2000 season. For those years at least, Sharp (and Ackerley) intended to be bound by Washington law. If the parties' intentions, then, are to be given any weight, they fall on the side of Washington rather than New York law.

■ In its Reply Memorandum, Sharp points out that the choice of law clause also includes a choice of forum component. Sharp seems to argue that since Ackerley disregarded the clause's forum requirement by bringing suit in New York, Ackerley somehow waived its right (assuming it *is* a right) to have the TSA interpreted under Washington law. *See* Def.'s Reply Mem. at 3 ("Ackerley wants to have its cake and eat it too."). Sharp mistakenly conflates choice of law and choice of forum analyses. As explained above, the choice of law analysis is a "grouping of contacts" inquiry. A choice of forum analysis is much more straightforward. "The federal courts traditionally have accorded a plaintiff's choice of forum considerable deference." *In re: Ricoh Corp.,* 870 F.2d 570, 573 (11th Cir.1989); *see also Weiss v. Columbia Pictures Tele., Inc.,* 801 F.Supp. 1276, 1278 (S.D.N.Y.1992) (citing *Ricoh* ). A defendant may nevertheless challenge the plaintiff's choice of forum on the basis of a forum selection clause, at which point "the burden shifts to the plaintiff to demonstrate exceptional facts explaining why he should be relieved from his contractual duty." *Id.* In the instant case, however, Sharp has not asked the court to *enforce* the choice of forum clause, and the court declines to transfer this case sua sponte to the district court in Washington. *See Lead Indus. Ass'n, Inc. v. OSHA,* 610 F.2d 70, 79 n. 17 (2d Cir.1979). The fact that Ackerley chose to ignore the forum selection clause and bring suit in New York does not otherwise alter the court's choice of law analysis.

## B. *The Validity of the TSA*

■ Now the court turns to the merits of Sharp's argument, viz., that the TSA is unenforceable because it left a material term–price–open to future negotiations. Relying on *Washington Chocolate Co. v. Canterbury Candy Makers,* 18 Wash.2d 79, 138 P.2d 195 (1943), *Randall v. Tradewell Stores, Inc.,* 21 Wash.2d 742, 153 P.2d 286 (1944), and *Snohomish County Public*

*Utility District No. 1 v. Broadview Television Co.,* 91 Wash.2d 3, 586 P.2d 851 (1978), Sharp claims that "where a contract has omitted clear terms of payment or left them to unsuccessful future negotiations, the contract becomes unenforceable." Def.'s Reply Mem. at 3. The court disagrees with Sharp's broad proposition.

The Supreme Court of Washington has made clear that "[i]t is not necessarily fatal to the formation of a contract that the parties did not agree on the exact amount to be paid by the purchaser." *Howard v. Fitzgerald,* 58 Wash.2d 403, 363 P.2d 386, 388 (1961). In that particular case, the court held that a seller's offer to sell equipment at a "reasonable value" and inventory at "wholesale value" was not fatal to the formation of a contract. *Id.; see also Combs v. Frigid Foods Prods., Inc.,* 67 Wash.2d 862, 410 P.2d 780, 782 (1966) ("An agreement is not unenforceable for lack of definiteness of price or amount if the parties specify a practicable method by which the amount can be determined by the court without any new expression by the parties themselves.").

In the case at bar, the price term of the TSA has two components: A base of $144,200, and an annual increase "not to exceed 6% ... [and] to be mutually agreed upon by the parties." This sort of fee augmentation arrangement is typically referred to as an "escalator clause" and is normally enforceable provided its terms are sufficiently definite. *See* 17A Am.Jur. Contracts 2d § 207 (1991). Ackerley does not dispute that an amount "to be mutually agreed upon" is ambiguous. That is why their claim for relief is only for the base price of $144,200. Sharp, however, argues that the ambiguity of the escalator clause somehow renders the entire TSA unenforceable. Sharp is mistaken. In *Seattle–First National Bank v. Earl,* 17 Wash. App. 830, 565 P.2d 1215 (1977), *pet. denied,*

89 Wash.2d 1017 (1978), the Washington Court of Appeals was faced with a similar situation. In that case, a dispute had arisen over an escalator clause in a lease. The lease's escalator clause tied annual rent increases to a "cost-of-living index for the City of Spokane." *Id.* at 1217. However, after the lease had been entered into, the parties discovered that there was no such thing as a cost-of-living index for Spokane. The lessor filed suit to reform or rescind the contact. The court refused to reform the contract to incorporate an existing cost-of-living index for Seattle, and the court likewise refused to rescind the contract. The proper remedy, according to the court, was simply to give the escalator clause no effect and to otherwise hold the lease enforceable. *See id.* at 1219–20. This court therefore holds that, in the instant case, the TSA is not unenforceable under Washington law for lack of definiteness as to price.

The cases cited by Sharp are not on point. In *Washington Chocolate,* the goods for sale in the purported contract were "Chocolate Coatings ... at current price list." *Wash. Chocolate,* 138 P.2d at 196 (Wash.1943). The court held that such a description was too indefinite to form a binding contract given that "different prices were charged to different buyers and that this was at the discretion of [the seller]." *Id.* at 198–99. The case at bar is distinguishable in that there was a base price to which the parties did agree (and which Sharp actually paid in 1998–1999 and 1999–2000). Moreover, the contract in *Washington Chocolate* was still executory whereas Sharp has alleged that it has wholly performed its obligations under the TSA. *See id.* at 199.

*Randall* is altogether inapposite in that it concerned an ambiguity as to contract duration, *see Randall,* 153 P.2d at 289–90, and *Snohomish County P.U.D. No. 1* actu-

ally runs counter to Sharp's argument, *see Snohomish County P.U.D. No. 1,* 586 P.2d at 857 ("[A] contract which has been partially performed, even though it may be too indefinite to enforce in an action for specific performance, or to support a recovery of damages for failure to perform, is enforceable to the extent that performance has made its terms certain.").

In sum, the TSA is not unenforceable under Washington law for lack of definiteness as to price.

### C. Sufficiency of the Pleadings

■ Finally, Sharp argues that the complaint must be dismissed because "there are no *specific* allegations that plaintiff performed during 2000–2001." Def.'s Mem. at 6 (emphasis added). Apparently Sharp believes that an "absence of itemized averments of [Ackerley's] performance" is somehow fatal to Ackerley's claim. *Id.* at 7.

The plain language of Fed.R.Civ.P. 9(c) would seem to indicate otherwise. According to Rule 9(c), "[i]n pleading performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred." Perhaps because this language is so straightforward, there is relatively little case law interpreting this rule. The court knows of no Second Circuit case passing on the matter, but other circuits have made clear long ago that a general averment of performance is sufficient to withstand a motion to dismiss. *See, e.g., Fitz–Patrick v. Commonwealth Oil Co.,* 285 F.2d 726, 729 (5th Cir.1960) ("Rule 9(c) specifically exempts the pleader from the necessity of alleging detailed supporting facts to show the performance of conditions precedent."); *Topping v. Fry,* 147 F.2d 715, 718 (7th Cir.1945) ("We think the complaint sufficiently complied with Rule 9(c) which permits a general

averment that all conditions precedent have been performed or have occurred."). In its complaint Ackerley has pleaded that "Ackerley Media fully performed its obligations as required by the contract for the 2000–2001 NBA season." Compl. ¶ 19. That alone is sufficient for Rule 9(c) purposes.

## IV.   CONCLUSION

For the foregoing reasons, defendant Sharp's motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) must be DENIED.