[No. 12932-9-II.   Division Two.   January 6, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS FAULK KRON, *Appellant*.

*David W. Murdach* and *James W. Burdue,* for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney,* and *Barbara L. Corey-Boulet* and *Michael R. Johnson, Deputies,* and *John M. Neeb, Legal Intern,* for respondent.

WORSWICK, J.* — Thomas Faulk Kron appeals his conviction by a Pierce County jury for aggravated first degree murder, conspiracy to commit aggravated first degree murder, and two counts of first degree assault. The State asked for the death penalty, but the jury decided on a life sentence without parole. Kron raises nearly two dozen issues on appeal, but there was no reversible error and we affirm.

## FACTS

The victims were Tom Kron's former girl friend, Dlorah "Susie" Kron, who was stabbed to death, and her two children, a 4-year-old boy named Jeramaine and a 2-year-old girl named Amberjina, who were stabbed and beaten but recovered from their wounds. The State's theory was that Tom Kron solicited Les McVay, a convicted felon and close friend of Kron's, to execute the crimes. McVay was charged jointly with Kron, but his case was severed from Kron's and was tried first to the court sitting without a jury. A superior court judge found McVay guilty on all counts and imposed a sentence of life without parole, but sealed the penalty until Kron's trial was finished. Not even McVay knew what his sentence was.

The same judge also presided over Kron's jury trial. McVay testified as the State's witness to "clear [his] conscience". Kron had been adjudicated the father of Jeramaine and ordered to pay nearly $10,000 in child support arrearages, and his wages were being garnished to the tune of $500 a month. McVay testified that Kron asked him to kill Susie and the children in order to avoid the support obligation. He said that Kron threatened to kill Les and his family if he did not carry out the murder, but also testified that Kron offered compensation in the form of forgiving various debts McVay owed to Kron and sharing in a $1,500 accident settlement that Kron had received.

---

*Judge Stanley W. Worswick is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

Les McVay related the details of Kron's plan for the murder, including an alibi that placed Kron conspicuously in a restaurant soon afterward, supposedly waiting for Susie to pick him up. According to McVay, Kron gave him a knife (the murder weapon), a pair of surgical gloves, a .22 caliber pistol in case "things got out of hand", and a small bag in which McVay placed those items as well as a change of clothing. Kron arranged for Les's uncle, Jim McVay, and his girl friend, Donna Britton, to drive Les to Susie's neighborhood and wait while he carried out the crime, and instructed Les on a ruse to gain entrance to Susie's house. Kron also told Les to steal $700, which he expected to be in Susie's purse.

On the night of the murder, Kron waited in his apartment in Sumner while the others drove to Susie's neighborhood in University Place. When they arrived, Les told Jim why they had driven there and expressed reservations about killing the children. He testified that his Uncle Jim told him to "leave the children out of it". Les entered the house while Jim and Donna drove around the area. He described how he stabbed Susie to death and said that when the children saw what had happened to their mother, they began running around and screaming so he stabbed them and kicked them in the head to "shut them up".

After the murder, forgetting to rifle Susie's purse, Les went outside and got into Jim's car, and they left the scene. Les directed Jim to stop behind the Galaxy Restaurant, on Kron's instructions, to throw the knife, gloves, and bloody clothing into the Puyallup River. They returned to Kron's apartment, where Les reported to Kron that "everything was done", and shortly afterward they all drove to a nearby restaurant, KC's Caboose. Kron made a point at KC's of saying loudly, so the waitress could hear, that he was waiting for Susie to arrive, and later of pretending to call Susie to find out why she had not yet arrived.

Jim McVay's testimony essentially corroborated Les's account of their driving to Susie's house, Jim and Donna's waiting in the vicinity, and the trip back to Kron's with the

stop at the river to dispose of evidence. Jim assumed that he was taking Les to retrieve some drug money and professed ignorance of the real purpose of the trip until they arrived at Susie's. Jim testified that he and Les discussed the murder in the following days, and that Les stated at one point, Tom "owes [me] for life now". Jim and Donna Britton ultimately admitted what they knew to the police, and neither was charged.

Kron was convicted as Les McVay's accomplice (RCW 9A.08.020) and coconspirator (RCW 9A.28.040). His defense was that McVay was lying. He testified that he, Kron, never discussed killing Susie with McVay; instead, he arranged the transportation to University Place so that McVay could burglarize a real estate office near Susie's house, and was surprised and angry when McVay told him a few days later that he had killed Susie, thinking that he had done Kron a favor. The jury obviously did not believe this story; it convicted him on all counts. At sentencing, in addition to the sentence of life in prison without possibility of parole for aggravated first degree murder, RCW 10.95.030(1), Kron received lesser, concurrent sentences on the other counts.

## SENTENCE OF LIFE WITHOUT PAROLE

Kron's primary argument is that he should not have received life without parole because such a sentence is unavailable under the Sentencing Reform Act of 1981 (SRA). He argues that RCW 10.95.020, which sets forth the various ways of committing aggravated first degree murder, does not create a separate crime or an element of first degree murder, but is a penalty enhancement statute. *See State v. Kincaid*, 103 Wn.2d 304, 692 P.2d 823 (1985). If it is not a crime, he says, then the SRA improperly lists it as a seriousness level XIV crime in the punishment grid set forth at former RCW 9.94A.310 and .320; thus, the SRA lists a punishment for a nonexistent crime. Kron asserts that because RCW 10.95.030 requires either the death penalty or life without parole for aggravated murder, and because the SRA is intended to govern all aspects of felony

punishment and mistakenly lists a noncrime in level XIV, the statutes are in conflict. When statutes are ambiguous or in irreconcilable conflict, the rule of lenity takes hold. *See State v. Workman*, 90 Wn.2d 443, 454, 584 P.2d 382 (1978). Therefore, Kron concludes, the sentence prescribed in the SRA for the most serious actual crime, first degree murder, applies instead of the aggravated murder enhancement found outside the SRA in RCW 10.95.

■ This argument is novel but not persuasive. Our central task in construing statutes is to ascertain the legislative intent. *State v. Keller*, 98 Wn.2d 725, 728, 657 P.2d 1384 (1983). In so doing, we should construe a statute so as to avoid strained or absurd consequences. *State v. Keller, supra.* If two statutes pertain to the same subject matter, they must be harmonized whenever possible. *Snohomish Cy. PUD 1 v. Broadview Television Co.*, 91 Wn.2d 3, 586 P.2d 851 (1978). The Legislature has specified in two separate statutes that death or life in prison without parole will be the only sentencing alternatives for someone who commits aggravated murder. The Legislature could not have intended any other penalty.

■ It is true that RCW 10.95.020 enumerates the penalty enhancement factors added to premeditated first degree murder and does not describe elements of a separate crime. *State v. Kincaid, supra.* This statute does not conflict with the SRA, however. Two explicit purposes of the SRA are to ensure that punishment is (1) proportionate to the seriousness of the offense, and (2) commensurate with the punishment imposed on persons committing similar offenses. RCW 9.94A.010(1), (3). Aggravated murder is more serious than murder in the first degree, which lacks the statutory aggravating circumstances. *State v. Irizarry*, 111 Wn.2d 591, 595, 763 P.2d 432 (1988); *Kincaid*, 103 Wn.2d at 312. Therefore, the aggravated murder statute, RCW 10.95, functions consistently with the SRA by prescribing a more severe penalty than that provided in the SRA for "ordinary" first degree murder. Likewise, to satisfy the SRA's purpose of like sentences for like crimes, it is important that "ordinary"

first degree murderers and aggravated murderers not receive the same degree of punishment. The statutes are harmonious, not inconsistent. To construe them as Kron urges would thwart the obvious legislative intent and lead to an absurd result, that of disregarding the shared, stated purpose of both the aggravated murder statute and the SRA to provide harsher penalties for aggravated murder.

### DEATH-QUALIFIED JURY

■ Kron next raises the issue of the "death-qualified" jury, *i.e.*, a jury in a capital case from which prospective jurors have been excluded for cause because of their attitudes toward the death penalty. Although he did not receive a death sentence, he postulates that such juries are unusually prone to convict. He concedes that the prosecutorial practice of excluding all jurors opposed to capital punishment is permissible under the United States Constitution, *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), but he argues that the issue remains unresolved under the Washington Constitution, article 1, sections 21 and 22. He is wrong. The Supreme Court has already decided that "the process of death qualifying a jury in accordance with the law and practice of this State . . . is not violative of either the state or federal constitution." *State v. Hughes*, 106 Wn.2d 176, 188, 721 P.2d 902 (1986).

### CHARGING — DENIAL OF EQUAL PROTECTION

■ Kron argues that he was denied equal protection of the laws by the State's election to charge him with the capital crime of premeditated murder with the aggravating circumstance of solicitation, RCW 10.95.020(5), rather than with the noncapital felony of conspiracy to commit first degree murder, RCW 9A.28.030. This argument fails. Where the selective enforcement of criminal statutes is not arbitrary, capricious, or based on unjustifiable standards, equal protection is not denied. *Workman*, 90 Wn.2d at 456. The State has broad discretion in making charging decisions based on a range of statutory factors. RCW 9.94A.440.

Equal protection is denied where the prosecutor has discretion to seek various degrees of punishment by proving identical criminal elements. *State v. Ensminger*, 77 Wn.2d 535, 463 P.2d 612 (1970). That is not what happened here. The elements of solicitation to commit murder, RCW 9A.28.030, are not the same as the elements of premeditated murder committed with the aggravated circumstance of solicitation, RCW 10.95.020(5). Mere solicitation does not require completion of the solicited crime; premeditated murder by solicitation requires a dead victim.

Kron also ventures an equal protection argument with respect to the charge of criminal conspiracy to commit aggravated murder versus the lesser charge of conspiracy to commit first degree murder, RCW 9A.28.040. He points out that conspiracy is not listed in RCW 10.95.020 as a circumstance establishing aggravated murder, but he never explains how he was denied equal protection by the prosecutor's election to charge conspiracy to commit aggravated murder rather than conspiracy to commit first degree murder. The State had every right to charge aggravated murder for the death of Susie Kron, and it also had the right to charge Kron and Les McVay with conspiring to commit her murder, a class A felony in its own right. RCW 9A.28.040(3)(a); RCW 9A.32.030(1)(a).

■ ■ We find no equal protection violation here, but without explicitly articulating it, Kron does raise a valid point: The State should not have charged him with conspiracy to commit aggravated murder, because there is no such crime. The pertinent statute lists the highest degree of criminal conspiracy as a class A felony "when an object of the conspiratorial agreement is murder in the first degree". RCW 9A.28.040(3)(a). This is the most serious kind of conspiracy found in Washington law; there is no statutory mention of any higher crime of conspiracy to commit aggravated murder. As we have seen, aggravated murder itself is not a crime, but a means of enhancing the penalty for certain kinds of first degree murder. Obviously, the State cannot charge a crime without statutory authority. This mistake

did not prejudice Kron, however. Assuming that the proper charge was criminal conspiracy to commit first degree murder, a conviction for that offense inheres in the jury's conviction of Kron for conspiring to commit aggravated murder, *i.e.*, first degree murder with aggravating circumstances.[1] Any error is harmless.

## Proof of Aggravating Circumstances

### A. Burglary.

■ Kron contends that the trial court erred in denying his motions to dismiss the aggravating factors of burglary and agreement to pay money for the murder. As for the burglary, he argues that there was no evidence that Les McVay intended or attempted any crime other than the murder of Susie Kron, and because the putative burglar must intend some crime other than the murder itself, the aggravating factor relating to burglary is "completely contrived". This argument fails, for two reasons — one legal and one factual. First, Kron relies on cases that focus on the laudable goal of carefully limiting the class of persons who are eligible for the death penalty, so as to avoid its arbitrary and capricious application. *E.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980); *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983). Kron did not receive the death penalty, so these cases do not apply. Second, and equally fatal to his argument, Les McVay admitted his intention to enter Susie Kron's house to steal $700 from her purse. Unlawful entry for the purpose of stealing something is burglary of the most common kind. McVay had the requisite intent to steal, so we need not consider his argument that the intent to kill

---

[1]Nor was Kron prejudiced in sentencing. The correct range is arrived at by intersecting Kron's offender score (6) and the seriousness level of the completed crime of first degree murder, (XIII), multiplied by .75 because conspiracy is an "anticipatory offense". Former RCW 9.94A.310, Table 1. Thus, the range is 312 to 416 months x .75 = 234 to 312 months. Not only is this higher than the range of 218.25 to 291 months calculated by the trial court on the conspiracy count, but the sentence of 291 months actually imposed lies well within the correct standard range. Moreover, the sentence runs concurrent to one of life without parole for aggravated murder.

would not by itself establish an element of burglary as an aggravating circumstance.

B. Solicitation/Agreement.

█ As for the aggravating factor of agreement or solicitation to commit murder in exchange for money, the defense moved to dismiss on this ground at the close of all the evidence, contending that the testimony failed to show a "head-to-head agreement [between Kron and Les McVay] as to monetary element that the state has alleged." This is really a sufficiency of the evidence argument, to which we apply the usual standard; *viz.*, after viewing the evidence in a light most favorable to the prosecution, could any rational trier of fact have found the essential elements proven beyond a reasonable doubt? *State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980).

Kron is flatly wrong. McVay testified that in exchange for the killing, Kron offered to forgive an old debt, pay him some of the $1,500 proceeds from an accident settlement, and hold McVay harmless for a pistol of Kron's that a "girl" had stolen; and that "[t]here was money mentioned that I could possibly get." Although McVay also testified that he committed the murder out of fear of Kron, the evidence of an agreement or solicitation of murder for money is sufficient.

AGGRAVATED MURDER VERDICT FORM

Kron contends that the trial court erred by giving the jury an aggravated murder verdict form, over defense objection, that did not require the jury to specify what aggravating factor it found. The challenged verdict form merely asked the jury whether Kron was guilty of "the crime of Aggravated Murder in the First Degree . . .". He argues that this form, in combination with instruction 11,[2] creates the possibility that the jury did not find one or both of the

---

[2] Instruction 11 reads:

"To convict the defendant of the crime of aggravated murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

alleged aggravating circumstances beyond a reasonable doubt. *See State v. Kincaid*, 103 Wn.2d 304, 692 P.2d 823 (1985); *State v. Martin*, 41 Wn. App. 133, 138, 703 P.2d 309 (aggravating circumstances not elements of underlying crime, but still must be proven beyond a reasonable doubt), *review denied*, 104 Wn.2d 1016 (1985). He posits confusion from the fact that instruction 11 requires the jury to agree unanimously on the presence of an aggravating factor, but form A requires only a general verdict on aggravated murder.

■■ ■■ The verdict form and instructions were legally sufficient, *i.e.*, they permitted each party to argue his theory of the case, were not misleading, and correctly stated the applicable law. *State v. Mark*, 94 Wn.2d 520, 618 P.2d 73

---

"(1) That on or about the 2nd day of June, 1988, the defendant solicited, commanded, encouraged, or requested another person to cause the death of Dlorah S. Kron;

"(2) That the defendant solicited, commanded, encouraged, or requested the other person to act with intent to cause the death of Dlorah S. Kron;

"(3) That the intent to cause the death of Dlorah S. Kron was premeditated by the defendant;

"(4) That Dlorah S. Kron died as a result of the acts of the defendant or another person he had solicited, commanded, encouraged or requested to so act; and

"(5) That the acts causing the death occurred in Pierce County, Washington; and

"(6) That one or both of the following aggravating factors were present:

"(a) The murder was committed in the course of, in furtherance of, or in immediate flight from the crime of Burglary in the Second Degree; or

"(b) That the defendant solicited another person to commit the murder and had paid or agreed to pay money or any other thing of value for committing the murder.

"If you find from the evidence that each of these elements (1) through (5) has been proved beyond a reasonable doubt, and also find that either (6)(a) or (6)(b), or both, have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. Elements (6)(a) and (6)(b) are alternatives. You must be unanimous as to which of elements (6)(a) or (6)(b), or both, was proved. It is only necessary to find that one of the elements (6)(a) or (6)(b) was proved in order to convict.

"On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements (1) through (6), then it will be your duty to return a verdict of not guilty."

(1980). The verdict form was not confusing; it simply asked the jury to state its decision once it had considered the charge pursuant to instruction 11.[3]

### MISTRIAL BECAUSE OF PROSECUTOR'S QUESTION

■ Kron next argues that he should have been granted a mistrial when the prosecutor, during his direct examination of Les McVay, in attempting to show that McVay had not received leniency or any promises in return for his testimony, asked this question: "In fact, during [McVay's prior] sentencing hearing, the prosecutor, myself, asked that you be put to death; isn't that correct?" The trial court sustained a defense objection, but declined to grant a mistrial. This was not error. A mistrial should be granted only when the remark of counsel so prejudiced the jury that " 'nothing the trial court could have said or done would have remedied the harm done to the defendant.' " *State v. Weber*, 99 Wn.2d 158, 165, 659 P.2d 1102 (1983) (quoting *State v. Gilcrist*, 91

---

[3]Although Kron's argument is unpersuasive, it does call attention to an anomaly found in both the charging information and instruction 11, the elements instruction on aggravated first degree murder. Kron was charged with alternative means of committing aggravated first degree murder: agreement with or solicitation of another to commit murder in exchange for money or any other thing of value; or committing murder in the course of, in furtherance of, or in flight from a burglary. RCW 10.95.020(4), (5), (9)(c). Curiously, although the statute sets out agreement and solicitation as separate and distinct aggravating circumstances, the State lumped them together in its information and the jury was instructed on them together:

(6) That one or both of the following aggravating factors were present:

(a) [The burglary factor]; or

(b) That the defendant solicited another person to commit the murder *and* had paid or agreed to pay money or any other thing of value for committing the murder.

. . . Elements (6)(a) and (6)(b) are alternatives. You must be unanimous as to which of elements (6)(a) or (6)(b), or both, was proved. It is only necessary to find that one of the elements (6)(a) or (6)(b) was proved in order to convict.

(Italics ours.)

Kron was not prejudiced by this anomaly, because the jury was instructed to agree unanimously either that a murder occurred incident to a burglary or that Kron solicited and agreed to pay for a murder, and the evidence was ample to prove any and all of the aggravating circumstances: burglary, solicitation, *or* agreement.

Wn.2d 603, 612, 590 P.2d 809 (1979)). Only errors that may have affected the outcome of the trial are prejudicial. *State v. Gilcrist, supra.*

The defense argued for a mistrial on the ground that this question improperly attempted to bolster McVay's testimony and went beyond the bounds of the prosecutor's previous representations that he would not delve further into McVay's sentence. The trial court did not abuse its discretion in denying a mistrial. The remark was not so serious and prejudicial that only a new trial could have cured the error, and the court adequately remedied the situation by instructing the jury several times that the remarks of counsel were not evidence. *See State v. Essex,* 57 Wn. App. 411, 415-16, 788 P.2d 589 (1990).

### McVay's Sealed Sentence

Kron also raises a related issue, that the court erred by keeping McVay's sentence from the jury during Kron's trial. He contends that sealing the sentence denied him an opportunity to impeach McVay for bias and lack of credibility. He cites an 1891 case, *Anderson v. State,* 2 Wash. 183, 26 P. 267 (1891).

This argument fails. *Anderson* is inapposite. Although it held erroneous the sealing of a jury's death penalty verdict overnight until the jury could reconvene, the facts here are entirely different. Here, the judge sealed his own sentence pending trial of a codefendant so as to preclude the possibility that the jury in the second trial would be influenced by the prior sentence. Such prudence is to be applauded, not condemned.

We have other concerns about this argument. For one thing, we doubt that Kron has standing to challenge the sealing of McVay's sentence. He does not explain how he could have used the sentence to his benefit. The jury already knew that McVay had been convicted for his role, sentenced either to death or life without parole, and promised nothing for his testimony. Moreover, Kron is con-

spicuously ambivalent regarding this issue. On the one hand, he has argued that the court should have granted a mistrial because of the prosecutor's inquiry into McVay's sentence, and on the other hand he says that the court erred by not disclosing the sentence. He cannot have it both ways.

### DISQUALIFICATION OF JUDGE

Still another related issue is Kron's contention that the trial judge should have disqualified himself from presiding over Kron's trial after he had been the trier of fact in McVay's. Kron assumes that the trial judge was in the "awkward position" of deciding Kron's request to unseal the penalty imposed previously upon McVay, and should have "recused"[4] himself in favor of another judge who had not already formed an opinion on McVay's credibility. Kron cites no authority for this argument, and we will not consider it except to observe that he fails to allege any examples of actual bias on the judge's part, and that it was the jury, not the judge, who was the trier of fact in Kron's case.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MORGAN, A.C.J., and ALEXANDER, J., concur.

Reconsideration denied March 20, 1992.

Review denied at 119 Wn.2d 1004 (1992).

---

[4]Strictly speaking, to recuse is to challenge the judge. In response, the judge may or may not disqualify himself; he does not recuse himself. Recusal is the *process* that results in the judge's disqualification. Black's Law Dictionary 1277 (6th rev. ed. 1990).